UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

REPLENIUM INC.,

               Plaintiff,

     v.

ALBERTSONS COMPANIES, INC.,

               Defendant.

CASE NO. 2:24-cv-1281

**COMPLAINT AND DEMAND FOR JURY TRIAL**

     Plaintiff Replenium Inc. ("Replenium" or "Plaintiff"), by and through its undersigned attorneys, makes the following factual allegations applicable to each cause of action pled herein against Defendant Albertsons Companies, Inc. ("Albertsons" or "Defendant").

**PRELIMINARY STATEMENT**

     1.     Replenium brings this action against Albertsons for misappropriation of trade secrets, breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and unjust enrichment, based on Albertsons' systematic theft of Replenium's trade secret and confidential information for the purpose of building a system to replace and compete with Replenium.

     2.     Replenium is a Seattle-based software-as-a-service ("SaaS") company that provides groundbreaking auto-replenishment services to grocery retailers based on Replenium's trade secret technology, know-how, and processes.  Replenium's auto-replenishment platform (the

COMPLAINT AND DEMAND FOR JURY TRIAL - 1
CASE NO. 2:24-CV-1281

"Replenium Platform") provides grocery retailers with the unique ability to offer customers full grocery basket, auto-replenishment services that drive customer purchases and promote long-term customer retention for both retailers and brands.

3.      In October 2020, Replenium entered a SaaS contract with Albertsons, the second largest supermarket chain in North America, to launch the Replenium Platform, a first-of-its-kind, auto-replenishment solution that would enable Albertsons' customers to automatically replenish their grocery purchases across a full basket of grocery items.  Under the agreement and accompanying Statement of Work ("SOW") (referred to collectively as the "MSA"), Albertsons agreed to pay Replenium service fees based upon the net revenue generated through Albertsons' customers' replenishment orders.  The parties entered a mutual non-disclosure agreement (the "MNDA") to protect confidential information shared in connection with the Replenium Platform.

4.      The MSA anticipated Albertsons launching the Replenium Platform for Albertsons' customers in December 2020.  From the inception of the MSA, Albertsons represented to Replenium that it intended to expand the Replenium Platform nationwide, across its twenty-two banners, including Safeway, and over 2,200 stores across approximately 34 states and the District of Columbia.

5.      Albertsons internally and externally described the Replenium Platform as "industry revolutionizing" and proclaimed that "no other grocer is doing it yet."  Albertsons further stated that "the customer benefits, the financial benefits, and the ability to be first to market make this a top priority for the company."  It described the Replenium Platform's value in terms of growing its customers' purchases: "When customers can subscribe to their usuals, they inherently become more loyal, driving approximately one additional trip per quarter and a 15 percent spend increase."

6.      Despite Albertsons' representations to Replenium and enthusiasm for the Replenium Platform, Albertsons delayed its launch and expansion for nearly three years.  During that time, Albertsons made false promises and unscrupulously leveraged its market power to induce Replenium to (i) continue to invest in implementing the Replenium Platform, while

COMPLAINT AND DEMAND FOR JURY TRIAL - 2
CASE NO. 2:24-CV-1281

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

withstanding millions of dollars of losses directly attributable to its support for Albertsons, and (ii) share trade secret and confidential information, under the parties' MNDA and MSA, relating to the technology, know-how, and processes underlying the Replenium Platform.

7.      Even as Albertsons repeatedly delayed launching the Replenium Platform, Albertsons induced Replenium's ongoing investment of resources and confidential information sharing based on its internal and external statements that it planned a launch and nationwide expansion of the Replenium Platform.  For example, in December 2021, Albertsons issued a press release about its planned nationwide rollout of the Replenium Platform, stating that Schedule & Save was "developed in partnership with auto-replenishment and predictive shopping platform Replenium" and was part of "Albertsons Cos.' ongoing goal to revolutionize its digital offerings and enhance all aspects of the food experience to save customers time and money."  It continued, "[i]n 2022, Albertsons Cos. plans to expand the program nationwide and include a continuous expanding list of items for members to add for auto-replenishment."

8.      In a March 2022 call with Replenium and the Albertsons team, Albertsons' Senior Vice President of Digital Shopping Experiences, Jill Pavlovich, projected that the Replenium Platform represented a "massive opportunity," and further quantified that opportunity as a "$[4] billion-dollar opportunity by fiscal year 2024."[1] Ms. Pavlovich challenged the Albertsons team to prioritize subscriber acquisition for the Replenium Platform, stating: "Vivek [Sankaran, Chief Executive Officer] himself has challenged all of us, this group here, to get to 100,000 subscribers by the end of the year, a goal I know we can blow out of the water."

9.      Based on Albertsons' representations and inducements, under the protection of the MNDA and MSA, Replenium shared trade secret and confidential information for over three years, with hundreds of Albertsons' personnel, including its technical leads, solutions architects,

---

[1] Ms. Pavlovich's statement referred to a "$40 billion-dollar opportunity", but based on her stated calculation methodology, it appears that she intended to reference a still-significant, "$4 billion-dollar opportunity."  This complaint accordingly refers to the corrected $4 billion dollar calculation.

COMPLAINT AND DEMAND FOR JURY TRIAL - 3
CASE NO. 2:24-CV-1281

and senior managers.  During these meetings, Albertsons requested and received specific, detailed information about recommended process flows and business logic for key features of the Replenium Platform.

10.     Albertsons expanded its knowledge of the Replenium Platform by inducing Replenium to engage in a series of limited assortment pilots and small segment launches based on the promise of a nationwide expansion.  Unbeknownst to Replenium, during Replenium's three years of confidential information sharing, Albertsons was misappropriating Replenium's trade secret and confidential information by building its own competing, full grocery basket auto-replenishment solution to replace the Replenium Platform.

11.     Albertsons initially launched Schedule & Save with Replenium, with limited functionality, in Northern California in August 2022.  For the next year, Albertsons requested and received trade secret and confidential information from Replenium for the purpose of adding enhancements to its initial small segment launch.

12.     Even as Albertsons was building or planning to build its own replacement solution, it continued to induce Replenium to share more trade secret and confidential information and invest even further in support of Albertsons' incremental expansion of Schedule & Save.  For example, in January 2023, in the face of Albertsons' continued delays, Pavlovich continued to induce Replenium to share trade secret and confidential information and invest in enhancements based on Albertsons' promise of expanding the Replenium Platform nationwide.  As an added inducement, Pavlovich specifically pointed Replenium to Albertsons' recently-announced planned merger with The Kroger Company ("Kroger"), stating that Replenium stood to generate fees beyond Albertsons' replenishment volume because Replenium would "get Kroger out of this" too.

13.     In August 2023, Albertsons squeezed Replenium to support a final, critical enhancement to Schedule & Save based on Albertsons' promised nationwide expansion of the Replenium Platform in the fall of 2023.  Through the Replenium Platform, and based on Replenium's ongoing confidential information sharing, Albertsons added Replenium's Cart &

COMPLAINT AND DEMAND FOR JURY TRIAL - 4
CASE NO. 2:24-CV-1281

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Checkout functionality to Schedule & Save in 240 stores in Northern California.  At the same time, Albertsons disguised its true plans to launch its own platform by providing Replenium with misleading information.

14.     The August 2023 launch was a success; however, Albertsons' nationwide expansion of Schedule & Save on the Replenium Platform never happened.  On October 3, 2023, after three years of learning the technology, know-how, and logic behind the Replenium Platform, Albertsons abruptly terminated the MSA, astonishingly citing the Kroger merger as one of the reasons for terminating the MSA.  Albertsons almost immediately launched its own, nearly identical, full-basket auto-replenishment solution that it had built with unfettered access to and use of Replenium's trade secret and confidential information.

15.     As a result, Replenium, after investing over ten million dollars over three years of implementation and operation of its Replenium Platform with Albertsons, lost nearly the entirety of that investment on the eve of the planned, full-scale expansion, without realizing any of its service fee revenue under the MSA.  Albertsons' calculated maneuver cost Replenium millions of dollars that it invested in implementation and operation, tens of millions of dollars in anticipated revenue under the MSA, and a massive loss in Replenium's enterprise value due to its investment in a flagship customer that acted in bad faith by repeatedly squeezing and ultimately discarding Replenium in violation of the parties' contracts.

16.     Albertsons rolled out its competing platform in October 2023 and rapidly expanded Schedule & Save across the country to the vast majority of its large banners, such as Safeway, Vons, Albertsons, and Jewel-Osco, without paying for Replenium's technology and know-how that enabled Albertsons to launch an "industry-revolutionizing" auto-replenishment platform.

17.      Replenium seeks to hold Albertsons accountable for acting in bad faith, breaching its agreements, making false promises, and misappropriating its trade secrets and confidential information, without paying Replenium a license for its ongoing use and profits from the

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

technology and know-how underlying Replenium's first-of-its-kind full-basket, auto-replenishment platform for the grocery market.

## PARTIES

18.     Replenium Inc. is a Washington corporation with its principal place of business in Seattle, Washington.

19.     Albertsons Companies, Inc. is a Delaware corporation with its principal place of business in Boise, Idaho.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 and 18 U.S.C. § 1836(c).

21.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because substantial acts and omissions giving rise to the claims alleged herein occurred in this Judicial District.

## FACTUAL ALLEGATIONS

### I.     Replenium Develops Trade Secret Technology for Full-Basket Auto-Replenishment

22.     Tom Furphy founded Replenium in 2015 to develop and launch a first-to-market auto-replenishment service for grocery retailers that would provide grocery customers and brands with an automated and efficient tool for replenishing their routine grocery purchases. Furphy previously served as Vice President of consumables and AmazonFresh at Amazon from 2005 to 2009, where he was responsible for the underlying strategy, development and execution of Amazon's grocery and health and beauty business.  Replenium's Chief Technology Officer, Umair Bashir, is also a former Amazon executive who served as a Manager of Software Development for Retail Customer Experience, where he helped build Subscribe & Save, and later as a Senior Manager, Vendor and Product Management.

COMPLAINT AND DEMAND FOR JURY TRIAL - 6
CASE NO. 2:24-CV-1281

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

23.     Replenium was the first company to successfully create a full-basket auto-replenishment system for grocery retailers that automatically schedules customers' product replenishments orders and organizes deliveries and pick-ups based on replenishment schedules and customer preferences.  This goes far beyond traditional product subscription platforms to accommodate the high frequency, large product assortment, large shopping basket size and complexity of grocery shopping.  To date, no other grocery retailer, outside of Albertsons, has launched a comparable auto-replenishment solution.

24.     Replenium's technology and business logic enable customers to automate large portions of their everyday purchases by making it simple for them to identify and add items to their auto-replenishment list, then automatically create orders, tender payment, and schedule orders for delivery or pick-up when products are due to be replenished.  This is all done with little to no human intervention.  The confidential and proprietary technology and business logic that supports this auto-replenishment platform constitutes Replenium's "Trade Secrets."  Replenium's level of automation has never been available on large baskets of goods, like those in a regular trip to the grocery store.  Unlocking this functionality helps ensure that customers do not run out of the products they need while providing a recurring revenue stream to retailers.

25.     Replenium created its Trade Secrets through years of research, development, and testing across many customer use cases such as handling large orders, making order changes, handling multiple temperature zones, accommodating products with shelf life and replenishment cycle variation, and changes in delivery timing or method.  Replenium's solution addresses a retail market that is several times larger than that captured by traditional product subscription software, such as Amazon's Subscribe & Save.

26.     Replenium offers retailers the Replenium Platform through SaaS contracts that provide retailers with access to the Replenium Platform and ongoing operational and technology support, all under strict contractual protections for Replenium's Trade Secrets and other

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

confidential information.  Replenium does not operate as a software development firm and does not perform development services for clients.

27.     Retailers benefit from implementing the Replenium Platform by enabling them to drive larger and more frequent digital shopping cart orders and better forecast labor and inventory needs.  Brands benefit from predictable revenue streams from replenishment orders, valuable data related to purchasing patterns, and an increase in shoppers' brand loyalty.  And, finally, customers receive personalized automated digital shopping carts based on their preferences and historical shopping preferences while simultaneously saving time with automated fulfillment that fits seamlessly into their lives.

28.     Many other retailers have attempted to create a system like the breakthrough Replenium Platform, but outside of Albertsons none have succeeded.  Companies like Amazon and Chewy created product subscription systems that operate on a single item and small order level only.  The Replenium Platform stands apart because it can automatically generate entire shopping carts—not just single items preselected by customers—as well as delivery schedules based on customer preferences without any input required by the customer after the initial order.

29.     Other grocery retailers, such as Walmart, have publicly announced their intentions to launch a full-basket auto-replenishment solution but have yet to successfully do so.  And Amazon, which only recently launched its Amazon Fresh replenishment solution in February 2024, does not offer customers the ability to truly configure auto-replenishment for their grocery needs, still requiring the customer to make decisions and manually, not automatically, execute orders.

**II.      Replenium Enters into MSA with Albertsons to Create a Full-Basket Auto-Replenishment System for Albertsons Stores**

30.     Recognizing the immense value that could be derived from implementing the Replenium Platform, Albertsons sought to contract with Replenium to gain access to the

COMPLAINT AND DEMAND FOR JURY TRIAL - 8
CASE NO. 2:24-CV-1281

Replenium Platform and secure Replenium's services and expertise to offer a full-basket auto-replenishment system to Albertsons' customers.

31.    On June 17, 2020, Replenium and Albertsons entered into the MNDA to enable Replenium and Albertsons to "share information for the purpose of evaluating the suitability of entering into a business relationship or in furtherance of an existing business relationship,"[2] and to "treat such information as confidential."  The terms of the MNDA applied to the parties' "parent, affiliates and subsidiaries, and its and their officers, directors, employees, contractors, consultants, agents and representatives."  MNDA § 1.

32.    The MNDA defined "Confidential Information" broadly to include:

> any and all information of the Disclosing Party and each of its
> parent, affiliates and subsidiaries that is not available to the public,
> including, but not limited to: trade secrets; techniques; methods;
> methodologies; product and manufacturing specifications; purchase
> or sales volume, manufacturing, marketing, development, customer
> (personal and aggregate data, including household and alternative
> IDs and tracking cookies and tags), employee, supplier, financial or
> operations information; technical, scientific, laboratory,
> experimental, research or statistical data; tooling; machinery;
> diagrams; drawings; forecasting; business and new product and
> service plans; reports; procedures; designs; formulae; recipes;
> improvements; records; processes; any and all current and future
> product information; facilities tours; know-how; data or any third
> party information and contracts that Disclosing Party is obligated to
> treat as confidential that is disclosed or made accessible to the
> Receiving Party directly or indirectly, in any form, whether written,
> oral, photographic, electronic, magnetic, computer, by inspection of
> tangible objects, or otherwise (including materials, records, reports,
> documents, prototypes, samples, plant and equipment) and
> information that has been subject to confidential treatment under a
> terminated or expired agreement between the parties.

*Id*. § 2.

---

[2] This was defined as the MNDA's "Purpose."

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

33.     The MNDA included thorough non-use and non-disclosure protections that prohibited the parties from, among other things, using the Confidential Information[3] for any purpose outside of the defined Purpose and from disclosing the Confidential Information to any of its representatives except those "who need to know the Confidential Information for the Purpose and who are bound to keep such Confidential Information confidential . . . ." *Id*. § 4.  Moreover, the MNDA restricted either party from "export[ing], reverse engineer[ing], disassembl[ing], or decompil[ing]" any prototypes, software or other tangible objects that embody the other party's Confidential Information.  *Id*.

34.     The parties also agreed to "take commercially reasonable measures to protect the secrecy of, and to prevent unauthorized disclosure and/or use of, the Confidential Information of the Disclosing Party."  Those measures were required to be "at least those measures that [the Receiving Party] takes to protect its own confidential information of similar import." *Id*. § 6.

35.     The MNDA enabled an open dialogue between Replenium and Albertsons regarding their potential business relationship, for the duration of that business relationship, and after the termination of that business relationship.[4]  Replenium relied on the MNDA to share its valuable and novel Trade Secrets and other Confidential Information with Albertsons because of the strong and clear protections of the MNDA.

36.     On or about October 7, 2020, Replenium and Albertsons entered into the MSA. The parties used Albertsons' template contract to draft the MSA, at Albertsons' insistence.

37.     The MSA, Section 9.1, affirmed that all confidential and proprietary information disclosed by one party to the MSA to the other party "concerning or pertaining to the business of the disclosing party shall be subject to the terms of the [MNDA]."  Further, Section 11.3(c) of the

---

[3] "Confidential Information" as used herein refers to the term as defined in the MNDA.

[4] The MNDA's term continued until terminated by the parties in writing.  § 11.  In addition, the MNDA provided that "each party's confidentiality obligations shall survive such termination until such time as the Confidential Information of the other party . . . becomes publicly known and made available through no breach of this [MNDA] . . . ." *Id*.

COMPLAINT AND DEMAND FOR JURY TRIAL - 10
CASE NO. 2:24-CV-1281

MSA provides that "Albertsons will use its reasonable efforts to protect Company's Intellectual Property rights in the Services and will report promptly to Company any infringement or misappropriation of such rights of which Albertsons becomes aware."  Section 11.6 of the MSA also provides that "Albertsons will not . . . (b) copy, modify or create any derivative works based on the Services or (c) disassemble, decompile, or reverse engineer the Services or permit any third party to do so."

38.    Pursuant to the MSA, Replenium agreed to provide Albertsons with "automated replenishment SaaS Services," MSA § 1, a full-basket auto-replenishment system based on Replenium's Trade Secrets and other Confidential Information and integrated into Albertsons' digital storefronts as "Schedule & Save."

39.    In exchange, Albertsons would pay Replenium "Fees specified in [the] SOW." *Id.* § 6.1.  "Fees" includes, among other things, "Service Fees" as set forth in Appendix B.  SOW § 1.1(e); *see id.* § 1.01(f).

40.    Pursuant to Appendix A of the SOW, Albertsons agreed to "pay [Replenium] a percentage Service Fee based upon Net Revenue generated through Replenishment Orders" in accordance with a tiered payment structure.  Under that schedule, Albertsons would pay Replenium a determined percentage of its auto-replenishment net revenue, with differing rates depending on whether the revenue was generated through Albertsons' own brands or branded products.

41.    Crucially, Albertsons would only pay Replenium the Service Fees anticipated by the MSA after Albertsons' launch and expansion of the Replenium Platform.

42.    The MSA was a service agreement and *not* a software development contract.  It expressly provided that "[n]othwithstanding any other provision to the contrary in this Agreement, the parties acknowledge that [Replenium] is providing automated replenishment SaaS Services and that [Replenium] will not be producing any Deliverables except as expressly set forth in an

COMPLAINT AND DEMAND FOR JURY TRIAL - 11
CASE NO. 2:24-CV-1281

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

SOW.  The SOW contains a table with an entry for deliverables and next to it, it states "N/A."

Similarly, the table in the SOW states "N/A" in lieu of a schedule for deliverables.

43.     The MSA defined a "Commercial Launch" of the Replenium Platform as "the date

mutually agreed to by the parties on which Customers are able to begin placing Replenishment

Orders in one or more geographic or segmented markets" but expressly excludes any "friendly

user trial of the Services." SOW § 1.1(c).

44.     Pursuant to the MSA, the Commercial Launch was initially set for December 31,

2020.  *Id.* at 1.  Albertsons agreed to cooperate in good faith with Replenium to carry out all its

obligations in the MSA.  *Id.* § 1.3.  Albertsons further agreed to "use commercially reasonable

efforts to market and promote the ability of Customers to place and manage Replenishment

Orders" through the Replenium Platform.  *Id.* § 1.6.

45.     The parties agreed to the terms of the MSA, and its payment structure, with the

expectation that Albertsons would rapidly launch and expand its use of the Replenium Platform

nationwide with a full set of service features.  The parties never contemplated Replenium

providing SaaS services for years without generating Service Fees from a nationwide expansion of

the Replenium Platform.  For the duration of the integration of the Replenium Platform,

Replenium would be operating at a significant loss, which would only make sense if it received

the Service Fees resulting from the launch and nationwide expansion of the Replenium Platform.

46.     The financial potential for Replenium was massive in light of the number of

Albertsons stores and its tens of billions of dollars of revenue, including billions of dollars of

ecommerce revenue.  Without the Service Fees, Replenium would not have entered into the MSA.

47.     Replenium's expectation that the volume of auto-replenishment orders would be

significant, as well as the resulting fees, was based not only on Albertsons' size and Albertsons'

projections, but also based on its own market research and past experience at Amazon.

48.     Albertsons was also aware that Replenium would be operating at a significant loss

until Albertsons widely expanded the Replenium Platform to its customers.  Replenium

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

periodically shared its financial information with Albertsons, demonstrating the monthly investment it was making to support Albertsons.  With this information, Albertsons established the expectation that it would rapidly execute a national expansion of the Replenium Platform from the beginning of the parties' relationship, and consistently reaffirmed this expectation throughout the parties' relationship.

49.     The SOW specifically provided that the "parties acknowledge that upon Commercial Launch it is in their mutual interest to maximize the number of Replenishment Orders placed by Customers." § 1.6.

**III.     Replenium Shares Trade Secrets and other Confidential Information with a Significant Number of Albertsons' Representatives Under the Protections of the MNDA**

50.     In July 2020, Replenium and Albertsons began collaborating and sharing Trade Secrets and other Confidential Information about the Replenium Platform, under the protections of the MNDA.

51.     Replenium and the Albertsons team tasked with coordinating and working with Replenium corresponded regularly via email, Microsoft Teams, Slack, and video calls discussing the Replenium Platform and Replenium's underlying technology that supported the Replenium Platform.  These frequent discussions included topics such as the underlying system architecture, integration details and processes, as well as strategic approaches to implementation and business logic.

52.     By October 2020, the parties were holding weekly Tuesday meetings (sometimes twice weekly meetings) to discuss progress and implementation of the Replenium Platform. Replenium and Albertsons maintained this level and frequency of communication over nearly the entirety of their three years working together on the Replenium Platform.  These communications regularly included discussions of Replenium's Trade Secrets and other Confidential Information.

53.     On the Replenium side, Chief Technology Officer and engineer Umair Bashir led the discussions, along with a team of Replenium's top technology and implementation team.  For

COMPLAINT AND DEMAND FOR JURY TRIAL - 13
CASE NO. 2:24-CV-1281

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Albertsons, frequent attendees of the calls included Sowjanya Naidu, (Technical Architect and Technical Lead); Krishna Movva (Engineering Manager); Bipin Chaudhari (Technical Program Manager); Lavanya Kambampati (Technical Lead); Trimurthulu Bommireddy (Solutions Architect); Ramanjaneya Reddy Karnati (User Interface Developer); Asha Choudhary (Product Manager); Krishna Wudaru (Engineering Manager); Vijay Maddu (Technical Lead); Kevin DeKorte (User Interface Lead); and Ganga Ramankulam (Technical Program Manager), to name a small selection of the over two-hundred Albertsons employees and contractors with whom Replenium shared Trade Secrets and other Confidential Information.

54. In addition to the regular calls between the two teams, many of which were recorded by Albertsons, Replenium also shared in writing Trade Secrets and other Confidential Information about the logic, technology and business strategies underlying the Replenium Platform. This information was communicated through, among other means, messaging services, such as Slack, email, as well as through PowerPoint presentations created by Replenium and shared with Albertsons under the MNDA and MSA.

55. For example, on July 9, 2020, Replenium shared with Albertsons a confidential presentation that included a "Technology Overview" of the "Architecture & Integration" of the Replenium Platform. The presentation included detailed information concerning Replenium's Microsoft Azure architecture, replenishment user and data flow explaining how customers and the Replenium Platform would respond and react to each other's inputs, and auto-replenishment recurring order flow. The presentation also provided detailed user experience design, including core customer notification and auto-replenishment item and order management features. Replenium emailed this presentation to Richa Gupta (Senior Director, Head of Loyalty Platform Innovations and Partnerships) and Jonathan Nouri (Senior Vice President of Loyalty) and presented it to Albertsons' internal team on June 23, 2020.

56. In a July 24, 2020 email, Replenium explained to Richa Gupta of Albertsons the auto-replenishment functionality and how it differed from subscription systems developed by

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Amazon, Chewy, Ordergroove, and Zuora.  Replenium further shared a confidential presentation detailing the same type of information.

57.     On September 9, 2020, Replenium shared with a team of Albertsons employees a confidential presentation entitled "Rp Albertson Combined Customer Journey," which laid out the step-by-step process through which a customer would engage with and navigate through the Replenium Platform, including how customers would subscribe to certain products, how the Replenium Platform would create what it referred to as auto-replenishment buckets and mixed bags, how customers would manage their product replenishments, and how the Replenium Platform would ensure that auto-replenishment orders placed through the Replenium Platform would be fulfilled.  Replenium sent this presentation by email to Richa Gupta; Ganga Ramankulam (Technical Program Manager); Roopa Acharya (Vice President of Software Engineering); Nitin Saksena (Senior Director of Omnichannel Architecture); and Igor Tsigelnik (Solutions Architect for eCommerce).

58.     On September 15, 2020, Replenium shared with over twenty Albertsons employees a confidential presentation entitled "Albertsons User Stories" which detailed the Replenium Platform's customer journey, including detailed process flow charts explaining how customers and the Replenium Platform would respond to each other's inputs to enable effective auto-replenishment and cart management.  The presentation also painstakingly detailed the most effective and efficient methods of utilizing the Replenium Platform and how best to design customers' experience to maximize user uptake and streamline ease of use in light of numerous interrelated systems.  Replenium sent this presentation via email to Roopa Acharya (Vice President of Software Engineering); Ganga Ramankulam (Technical Program Manager); Richa Gupta; Nitin Saksena (Senior Director of Omnichannel Architecture); Igor Tsigelnik (Solutions Architect for eCommerce); Tharun Mittapalli (Contractor); Zachery Baker (Principal User Experience Designer); Victor Teleron; Ganesh Reddiar (Mobile App Solutions Architect); Neetu Sultan (Senior Engineer Manager); Alok Gupta (Director of Enterprise Architecture); Cameron

COMPLAINT AND DEMAND FOR JURY TRIAL - 15
CASE NO. 2:24-CV-1281

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Craig (Vice President of User Experience); Alberto Attia (Principal User Experience Architect); Alicia Sanguinetti (Director of User Experience); Krishna Wudaru (Engineering Manager); Vikas Pathuri ( Director of eCommerce Engineering); Kristin Simao (Innovation Design Strategist) May Ou; Bobby Johnson; Lava Amba; and Trimurthulu Bommireddy (Solutions Architect).

59.    In another confidential presentation, titled "Replenium System Architecture – High Level Overview – September 2020", which Replenium shared with a large Albertsons team on September 17, 2020, Replenium provided a detailed overview of the product subscription processes enabling customers to subscribe to eligible products in the Replenium Platform.  It also provided a detailed overview and process flowchart for the Cart & Checkout feature, which provides a way for customers to easily and quickly add items to auto-replenishment that are in their ecommerce cart while at ecommerce checkout.  Cart & Checkout is a proven method to drive significant customer adoption of auto-replenishment.  Accordingly, Replenium strongly encouraged at the outset of the parties' contractual relationship that Cart & Checkout be developed and implemented as part of the Replenium Platform.

60.    Replenium sent the email attaching this System Architecture presentation to Roopa Acharya (Vice President of Software Engineering); Ganga Ramankulam (Technical Program Manager); Nitin Saksena (Senior Director of Omnichannel Architecture); Igor Tsigelnik (Solutions Architect for eCommerce); Tharan Mittapalli; Zachery Baker (Principal User Experience Designer); Victor Teleron; Ganesh Reddiar (Mobile App Solutions Architect); Neetu Sultan (Senior Engineer Manager); and Alok Gupta (Director of Enterprise Architecture).

61.    On October 21, 2020, Replenium provided Albertsons documentation concerning Replenium's Application Programming Interface ("API") and Software Development Kit ("SDK"), both unique to the Replenium Platform based on Replenium's technology and not otherwise made publicly available by Replenium.  Replenium shared these documents with multiple Albertsons employees, including Subha Burela (Business Analyst); Vijay Maddu

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

(Technical Lead); Sowjanya Naidu (Technical Architect and Technical Lead); Kevin DeKorte (User Interface Lead); and Shekhar Kale.

62.   Replenium also shared with Albertsons a document detailing its API endpoints, providing explanations and examples to Albertsons how to effectively utilize the Replenium Platform's API.  Over the course of the parties' relationship, Replenium repeatedly updated these documents and provided up-to-date information concerning its API and SDK to Albertsons.

63.   In addition, Albertsons required all of the API traffic to go directly through Albertsons' servers.  With the service calls being exchanged through its own gateway rather than Replenium's, Albertsons was able to gain more information and insight into the nature of the calls and the logic behind the technology.

64.   Replenium shared and gave Albertsons access to these Trade Secrets and other Confidential Information under the protections of the MNDA and MSA and continued to regularly share this type of information throughout the three years of the parties' relationship.

65.   The documents identified herein represent merely a sample of the materials shared by Replenium with Albertsons throughout their three-year contract period.  Replenium would not and has not shared this type of information with any outside party absent a non-disclosure agreement, such as the MNDA.  In fact, Replenium has never shared this depth of information with prospective customers, even when an NDA is in place.

66.   Albertsons consistently sought information about the Replenium Platform, under the MNDA and MSA, far beyond what was necessary for Albertsons to integrate the Replenium Platform into Schedule & Save.  Albertsons sought information that went to the core of the operation of the Replenium Platform—highly confidential and vigorously protected Trade Secrets and other Confidential Information.  Based on the protections in the MNDA and MSA and given Replenium's desire to ensure the success of the Replenium Platform, Replenium shared the requested information with Albertsons.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**IV.      The Rollout of the Replenium Platform is Repeatedly Delayed while
Albertsons Continues to Acquire Replenium's Trade Secrets and other
Confidential Information under the Guise of Moving Forward with a
Nationwide Expansion**

67.     After entering the MSA, Albertsons did not meet the December 31, 2020
Commercial Launch date and requested an extension of the Commercial Launch date to March 31,
2021.  Despite the significant costs of Albertsons' delay, Replenium agreed as a result of
Albertsons' enormous leverage and representations and inducements to Replenium to continue to
provide service.

68.     On or about January 26, 2021, Replenium and Albertsons executed Amendment
Number One to Statement of Work ("SOW Amendment 1"), wherein the parties agreed to adjust
the Commercial Launch date to March 15, 2021.  SOW Amendment 1 § 1.

69.     Replenium continued to diligently work with Albertsons so that it could achieve the
March 15, 2021 Commercial Launch date; however, Albertsons also failed to meet the March 15,
2021 Commercial Launch date.

70.     After the second failed Commercial Launch date, Albertsons induced Replenium to
continue to work toward a launch by making false promises that it was proceeding toward a
national expansion of the Replenium Platform, and by agreeing to cover a portion of Replenium's
increasing monthly losses.

71.     Albertsons did not follow through on its promise of a nationwide expansion.
Rather, Albertsons required Replenium to conduct limited pilots that were never anticipated by the
MSA or the parties' discussions about launching and expanding the Replenium Platform.

72.     For example, in or around September 2021, Albertsons conducted a pilot consisting
of approximately 120 stores in Northern California and only included a small fraction of products
eligible for Schedule & Save—approximately 250 stock keeping units ("SKU"), later increased to
1,200 SKUs—through the Replenium Platform.  This was well below Replenium's 50,000 SKU
recommendation, but the pilot still demonstrated the functionality and potential of the program.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

73.    Consistent with the expectations Albertsons set for Replenium, in a December 2021 press release, Albertsons announced a limited trial of Schedule & Save "developed in partnership with auto-replenishment and predictive shopping platform Replenium," with "plans to expand the program nationwide and include a continuous expanding list of items for members to add for auto-replenishment." Albertsons proclaimed that Schedule & Save, along with new meal planning technology, would "revolutionize its digital offerings and enhance all aspects of the food experience to save customers time and money."

74.    After the initial pilot, in 2022, Albertsons continued to promise a nationwide expansion of the Replenium Platform and expressed incredible optimism for the industry "revolutionizing" opportunity, with Replenium, to be the first grocery chain to launch a full-basket auto-replenishment platform. Albertsons' Senior Director of Omni Experiences, Alyse Wuson, expressed Albertsons' goal of "exponentially increas[ing] eligible SKUs" for the Replenium Platform.

75.    Albertsons also continued to reaffirm to Replenium that Albertsons intended to expand the Replenium Platform broadly across the country. For example, in a February 2022 presentation, Albertsons stated that it intended to expand the Replenium Platform in approximately 2,147 stores and have an initial 100,000 customers enrolled via its website and phone application by the end of fiscal year 2022.

76.    Albertsons' Senior Vice President of Digital Shopping Experiences, Jill Pavlovich, lavishly praised Replenium and the opportunity the Replenium Platform offered Albertsons. She communicated Albertsons' view that Replenium could drive billions of dollars in sales, and that the Replenium Platform had the full and vocal support of Albertsons' C-suite members. In a March 14, 2022 video call with Albertsons and Replenium representatives, Pavlovich stated:

> Apologies in advance because I can only stay just long enough to share how huge this program is and how important all the work you have done and will continue to do is to the goals of our company, both on our customer experience side and financially. So thank you,

1
2
3
4
5
6
7
8
9
10

thank you, thank you, thank you, thank you to all of you for the work you've done thus far and will continue to do to drive this program forward.  I mean, I think we're talking about *industry-revolutionizing stuff* right here.  Yes, there is Schedule & Save or Subscribe & Save out there in the market, but not with a grocer.  Not on the things you buy most often.  More often than anything, actually. . . . We do know this to be a massive opportunity for us.  First, assuming our [ecommerce] business hits $10 billion dollars, and [the Replenium Platform] grows to be about 40 percent of that, we're staring down the pipe at a *$4 billion [sic] dollar opportunity by fiscal year 2024*.  We also know that 60 percent of our customers' baskets, or their quote-unquote usuals, means they buy the same thing week over week, and the ability to subscribe to their usuals and save money is a huge benefit to our customers, especially to our convenience shoppers.  When customers can subscribe to their usuals, they inherently become more loyal, driving approximately one additional trip per quarter and a 15 percent spend increase.

11
12
13
14
15
16
17
18
19

And just to put, like, a point on this opportunity, *no other grocer is doing it yet.*  So the customer benefits, the financial benefits, and the ability to be first to market make this a top priority for the company.  In fact, as Alyse will share, *Vivek [Sankaran, Chief Executive Officer,] himself has challenged all of us, this group here, to get to 100,000 subscribers by the end of the year, a goal I know we can blow out of the water*.  So with that, I just want to say thank you again—thank you thank you, thank you—reiterate how excited I am personally about this program, but more importantly, how excited the entire leadership is about the capability, as well as reinforce that we have the support of the entire organization to make this a success.  I'm sure Alyse has on her agenda to talk about the meeting we just came out of with [Jennifer Saenz, Executive Vice President, Chief Merchandising Officer,] where she was like "yes yes yes yes yes" to everything Alyse was asking for from a topline view of the program.

20
21
22
23
24

77.     In this way, amongst many other direct communications to Replenium, Albertsons induced Replenium's continued services and sharing of Trade Secrets and other Confidential Information by repeatedly assuring Replenium that it would reap significant Service Fees resulting from a broad, full-feature, nationwide expansion that could yield tens of millions of dollars in revenue for Replenium.

25
26

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

78.     Albertsons represented to Replenium that Albertsons intended to launch Schedule & Save by mid-2022 and expand it nationally throughout the balance of the year.  In a June 30, 2022, email, Pavlovich stated "[h]ere's to [July 22] sticking like glue.  We cannot wait to get this running full speed ahead."

79.     Given Albertsons' projections and praise for the Replenium Platform, Replenium continued to push Albertsons to broadly expand the Replenium Platform as the parties had agreed. Nevertheless, in August 2022, Albertsons demanded that Replenium commence another limited pilot—again in Northern California—consisting of 254 stores.  Albertsons represented to Replenium that this limited pilot was to be followed by a national expansion, staggered through divisions, throughout the remainder of 2022.

80.     Again, the Replenium Platform proved to be a success; however, Albertsons still did not follow through with the planned national expansion.  Albertsons provided Replenium with a series of moving-target reasons to explain its delays, but every time Replenium worked with Albertsons to help it resolve the purported hurdles to a national expansion, Albertsons responded with a new explanation for its delays.

81.     During these delays, Albertsons continued to request and receive Trade Secrets and other Confidential Information from Replenium under the protections of the MNDA and MSA. For example, on October 16, 2022, Replenium shared with Albertsons' team its recommended customer journey enhancements, to which Albertsons responded by saying that there were "some really nice ideas in your document that we'd like to explore," and further requesting additional information: "knowing that you have industry expertise and data, if you were to prioritize all the suggested enhancements in the document, what would the order be?"

82.     Albertsons' delays also took a significant financial toll on Replenium, who was still supporting Albertsons as a good faith business partner, relying on Albertsons' representations and its belief that Albertsons was acting in good faith.

COMPLAINT AND DEMAND FOR JURY TRIAL - 21
CASE NO. 2:24-CV-1281

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

83.     Replenium shared financial information with Albertsons demonstrating the economic impact of Albertsons' unwarranted delays on Replenium.  Albertsons agreed to make interim payments to Replenium to cover a small portion of Replenium's losses, but it continued to delay the promised nationwide expansion while exercising its leverage to induce Replenium's continued performance.  Even with Albertsons' interim payments, Replenium was incurring millions of dollars of losses annually to support implementation of the Replenium Platform.  And, as Albertsons was aware, those losses would be immensely challenging for Replenium to sustain for a period of years.

84.     Again, in December 2022, Albertsons shared in writing with Replenium what it referred to as its "Banner Expansion Plan" to expand the Replenium Platform nationwide.  The Banner Expansion Plan showed that the Replenium Platform would be live in 97% of the Northern California stores, 100% of the Southern California stores, 100% of the Mid-Atlantic stores, 95% of Seattle stores, and 100% of the Southwest stores by the end of September 2023, among others, comprising 94% of Albertsons' stores, or 1,968 stores across the country.

85.     On January 9, 2023, Replenium met with Pavlovich and Wuson to reiterate its concerns about Albertsons' continued delays of the program.  Pavlovich responded that the delays were caused by Albertsons' prior business and product teams and that Pavlovich and the new team could not be held accountable for the prior team's performance.  During this meeting, Pavlovich informed Replenium that she had not even read the MSA because it was executed before she joined Albertsons.

86.     At a January 12, 2023 meeting with Albertsons, Replenium again expressed concerns regarding Albertsons' continuous delays of a national expansion.  Replenium explained that Albertsons' delays were taking a significant toll on Replenium given the fact that Albertsons was not paying Service Fees to Replenium to ameliorate its costs, as planned.  In response, Pavlovich pointed to the recently announced merger with Kroger and stated that in addition to Albertsons' volume, Replenium would "get Kroger out of this" if Replenium continued its work.

COMPLAINT AND DEMAND FOR JURY TRIAL - 22
CASE NO. 2:24-CV-1281

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

87.     At that time, Albertsons was in the process of negotiating a merger with Kroger. As of April 2, 2024, Kroger operated 2,722 grocery retail stores across the country under a variety of banner names, either directly or through its subsidiaries.  Albertsons' invocation of Kroger and referencing that Replenium would "get Kroger out of this" was intended to induce Replenium to continue investing time and effort in the Replenium Platform with Albertsons because the potential merger would significantly increase the reach of the Replenium Platform, thereby significantly increasing Replenium's Service Fees.

88.     Albertsons finally committed to an expansion in all Safeway stores by February 15, 2023.  Replenium spent countless hours and exhaustive resources leading up to this February 2023 expansion.  The teams from both parties were prepared for the rollout, but then just two days prior to the target date, Albertsons' corporate team abruptly canceled the expansion again.

89.     Replenium expressed its shock and disappointment to Albertsons, particularly given that all of its functionality was performing to specification.  In response, Albertsons' Omar Gajial, Executive Vice President, Chief Digital & Health Officer at the time, offered to identify a subset of stores or divisions where Albertsons could expand the Replenium Platform.  Albertsons ultimately never identified additional stores or divisions.

90.     Throughout 2023, Albertsons and Replenium continued to work on an economic resolution to Albertsons' seemingly inexplicable delays, but Albertsons repeatedly used its market leverage and promises of a national expansion to insist that Replenium continue its support without additional financial consideration.

91.     In an email from Albertsons in May 2023, after asking Replenium to increase its monthly investment in order to provide additional server capacity and labor, Albertsons reiterated that position: "Like you, we also remain big believers in this program's potential.  *We are just an estimated 1 month away from launching the Cart & Checkout experience for customers,* which should be a big unlock for the program.  If initial results are favorable, it will enable us to expand

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

this program across the enterprise.  *We look forward to crossing these milestones over the next few months!*" (emphasis added).

92.     Through Albertsons' limited pilots and staged enhancement launches, it repeatedly squeezed Replenium for Trade Secrets and other Confidential Information and significant investment, while Albertsons reaped the benefits of the Replenium Platform through further education about Replenium's technology and validation of the business case for Schedule & Save. At the same time, Albertsons denied Replenium Service Fees, or ultimately any compensation for its Trade Secrets and other Confidential Information while forcing it into financial challenges that were never contemplated by the parties' relationship.

**V.    With Continuing Access to and Use of Replenium's Trade Secrets and other Confidential Information, Albertsons Internally Develops a Competing System to Replace the Replenium Platform**

93.     Unbeknownst to Replenium, while Replenium was working with Albertsons to implement the Replenium Platform, Albertsons covertly began to develop a near-identical system (the "Albertsons Platform") meant to supplant the Replenium Platform for Schedule & Save.

94.     Albertsons did not inform Replenium that it had begun to develop the Albertsons Platform in parallel with its partnership with Replenium and took no apparent precautions to protect Replenium's Trade Secrets and other Confidential Information.  Rather, Albertsons worked in secret while continuing to receive Replenium's Trade Secrets and other Confidential Information under the protections of the MNDA and MSA.

95.     Indeed, throughout 2023, even as Albertsons was planning to terminate the MSA and launch the Albertsons Platform, Albertsons' team members sought more detailed and technical information concerning the inner workings of the Replenium Platform, including the business logic and rationale behind it.

96.     Notably, in February 2023, Albertsons proposed amending the MNDA to include a never-before-discussed Residuals clause that would permit Albertsons to use residual work relating to the Confidential Information.

COMPLAINT AND DEMAND FOR JURY TRIAL - 24
CASE NO. 2:24-CV-1281

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

97.     Specifically, on February 14, 2023, Jenny Liu of Albertsons sent an email to Replenium stating that Matt [Freeman] and I continue to work with the business team to look at the different options to our partnership with you." She went on, "[a]s we were talking about shifting our relationship into something more strategic, we would need a basic provision to the MNDA before we move forward with further discussions." She stated that this "basic provision" would "help ensure that we have the protection required as a public company in the long run as we think about what the strategic relationship can look like."

98.     The proposed amended MNDA included language that would have granted Albertsons the ability to use residuals of Replenium's Confidential Information, including information retained in the memories of its representatives who had access to Replenium's information. The proposed language provided:

> **Residuals.** Notwithstanding any language to the contrary, nothing in this Agreement will limit the ability of either party or any of its Representatives to use residuals relating to the Confidential Information of the other party. The term "**residuals**" means information of any kind included in or relating to the Confidential Information which is retained in the unaided memories of Representatives of either party who have had access to the Confidential Information, but not as a result of any deliberate effort to memorize the information. Without limiting the foregoing, neither party will have any obligation to limit or restrict the assignment of its employees or to pay royalties to the other party in connection with any use of residuals.

99.     Replenium rejected that proposal and made clear that it would not agree to Albertsons' use of Replenium's Confidential Information in that manner. Replenium was particularly puzzled by this exchange given that Albertsons' request for the residuals language came approximately two and a half years into the parties' commercial relationship.

100.     As Albertsons developed its undisclosed Albertsons Platform, it continued to probe Replenium for answers to technical questions and questions about the business logic behind the Replenium Platform. For example, in May 2023, via Slack messages, Albertsons contractors and

COMPLAINT AND DEMAND FOR JURY TRIAL - 25
CASE NO. 2:24-CV-1281

employees Jeyarani Sonai and Mary Ann Warner sought detailed information from Replenium employees Richard Rector and Hasaan Maajid about how the ordering process would and should work for an existing user who enrolls in Cart & Checkout in the Replenium Platform, as well as for new users.  Replenium responded in detail both about how the process works and *why* it was designed to work that way.

101.    Replenium further shared additional Trade Secrets and other Confidential Information with Albertsons regarding Cart & Checkout through a series of emails in May 2023. In these emails, several Albertsons employees, including a Technology Program Manager, questioned Replenium regarding the business logic supporting the order date for existing customers signing up for Cart & Checkout.  Replenium's CTO, Bashir, responded to a team of about six Albertsons employees, with details surrounding Replenium's suggested business logic to create the most efficient process for customers using Cart & Checkout.  All such information was shared pursuant to the MNDA and MSA.

102.    In the months leading up to Albertsons' termination of the MSA, Albertsons and Replenium continued to have bi-weekly meetings where the parties discussed expansion criteria and rollout timing.  Albertsons also continued to express its enthusiasm for the Replenium Platform, the partnership and the imminent national expansion, while Replenium continued to invest resources and share Trade Secrets and other Confidential Information to support the forthcoming expansion.

103.    Even in the month immediately prior to Albertsons terminating the MSA and launching the Albertsons Platform, Albertsons continued to work with Replenium toward a nationwide expansion that Albertsons knew would not happen, while collecting more information through a rollout of additional functionality for the Replenium Platform in the Northern California market.

104.    In an August 10, 2023 meeting between Albertsons and Replenium, Albertsons presented a deck showing that it would launch Cart & Checkout with the Replenium Platform in

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

10 stores on August 10, 2023.  Albertsons wrote that if it was successful, the experience would be expanded to the rest of the Northern California stores.  The same presentation showed that Cart & Checkout would be launched in 240 stores on August 30, 2023, and Albertsons confirmed, "[i]f all success criteria is met, we will start gradually expanding the program nationwide."

105.    In late August 2023, Albertsons launched the Cart & Checkout functionality with the Replenium Platform in Northern California.  This launch was confined to Safeway stores only in Northern California and no other Albertsons-owned banners.  Through this launch, the Replenium Platform was made available with enhanced functionality in approximately 240 stores. Albertsons launched Cart & Checkout on a small-scale by design, prior to terminating its MSA with Replenium, to ensure that it had sufficient information to utilize that feature in the Albertsons Platform without Replenium.

106.    As with prior limited launches, the Replenium Platform with Cart & Checkout proved successful, demonstrating the customer need and use for an auto-replenishment full-basket solution, and the commercial value of the Replenium Platform.  In fact, on September 6, 2023, Albertsons presented the metrics to Replenium for the original 10 test stores and showed that post the launch of the Replenium Platform with Cart & Checkout, Albertsons saw a 130% increase in auto-replenishment sales and 97% increase in auto-replenishment orders.

## VI.    Albertsons Terminates the MSA and Immediately Transitions from Replenium's Platform to its Albertsons Platform Using Replenium's Trade Secrets and other Confidential Information

107.    On October 3, 2023, without prior notice, Albertsons abruptly sent a letter to Replenium terminating the MSA.  Albertsons stated in the letter that the effective termination date was November 15, 2023.

108.    This termination came as a shock to Replenium.  There had been no indication from Albertsons that there were any potential issues with the Replenium Platform.  Indeed, just one day prior, on October 2, 2023, Albertsons and Replenium had scheduled code freeze dates in

COMPLAINT AND DEMAND FOR JURY TRIAL - 27
CASE NO. 2:24-CV-1281

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

anticipation of the upcoming November and December expansion dates for the Replenium Platform.  Code freeze dates represent a point in time in the development process after which the rules for making changes to the source code or related resources become more strict, which is meant to help move a project forward towards a release.

109.    During the same October 2, 2023 call between Albertsons and Replenium, which occurred the day prior to termination, Albertsons discussed the Banner Expansion Plan, which it said was planned to commence on November 7, 2023.  In that call, Albertsons informed Replenium that the Replenium Platform's expansion would occur so long as a "wallet project" was complete; however, Albertsons never explained the nature of the "wallet project" to Replenium, or why the wallet project was a hurdle to expansion.

110.    On an October 3, 2023 call, where Pavlovich and Wuson verbally notified Replenium of Albertsons' intent to terminate the MSA, Pavlovich cited "difficult times, budget constraints and an impending merger."  Thus, despite the announced Kroger merger being dangled in front of Replenium as a reason to continue its investment, it was later expressly cited to Replenium as a reason to terminate the entire contractual relationship.

111.    When Replenium asked what would happen to Schedule & Save, Pavlovich stunningly declared that Albertsons was prepared to continue to operate Schedule & Save with "internal functionality."

112.    Shortly after the termination, while working with Albertsons' transition team, Replenium learned that while Albertsons was receiving assistance from Replenium in preparation for the expansion of the Replenium Platform and regularly receiving Replenium's Trade Secrets and other Confidential Information from its chief technology employees, Albertsons was simultaneously and surreptitiously developing the Albertsons Platform.  Despite the confidentiality protections in the MNDA and MSA, and Albertsons' published Code of Ethics, Albertsons took no apparent steps to protect Replenium's Trade Secrets and other Confidential Information during its development of the Albertsons Platform.

COMPLAINT AND DEMAND FOR JURY TRIAL - 28
CASE NO. 2:24-CV-1281

113.    Indeed, Albertsons' Code of Business Conduct & Ethics emphasizes that "[p]rotecting information owned, licensed, or entrusted to the Company is not only vital to our success, but our *trustworthiness*." (emphasis added).  It goes on to provide that employees who have access to confidential information "[m]ust guard against the disclosure of that information, even to other associates unless authorized . . . ."

114.    While Albertsons' formal policies highlight integrity and trust, the Albertsons team working with Replenium apparently acted in stark contrast to these principles.  In fact, during a meeting on October 4, 2023 to discuss the transition, an Albertsons employee informed Replenium that Albertsons instructed its employees not to discuss with or mention to Replenium that Albertsons was developing the Albertsons Platform.

115.    On October 16, 2023, Replenium met with Gajial, an EVP for Albertsons, to attempt to salvage the MSA.  Replenium emphasized the success of the Replenium Platform up to that point and reminded Gajial that the MNDA and MSA continued to protect Replenium's Confidential Information from any type of use in connection with Albertsons' internal development of a competing platform.  Gaijal noted that Albertsons decided to build its own platform due to two specific challenges –the user signup experience and earlier development issues.  Both of these issues, however, were entirely attributable to Albertsons, making clear that these reasons were provided merely as pretext.

116.    On October 18, 2023, Albertsons launched the Albertsons Platform with a design and functionality that is strikingly similar to the Replenium Platform.  Albertsons continued to refer to the platform as Schedule & Save.

117.    Over the course of the parties' relationship, Replenium worked in various capacities with no less than two hundred Albertsons employees and independent contractors.  The parties' business teams had meetings at least every two weeks from Q1 2021 to Q4 2023. The technology teams of Replenium and Albertsons met at least weekly, and often twice per week. Replenium would have never disclosed information to Albertsons' large team over this lengthy

COMPLAINT AND DEMAND FOR JURY TRIAL - 29
CASE NO. 2:24-CV-1281

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

period without the protections provided by the MNDA and MSA, or, indeed, had it known that Albertsons was developing a competing platform.

**VII.     Replenium Suffers Significant Harm as a Result of Albertsons' Conduct**

118.     Replenium invested millions of dollars annually to support the integration and eventual launch of the Replenium Platform, causing close to ten million dollars of direct net losses from its investment in supporting Albertsons, even after factoring in payments Replenium received from Albertsons.

119.     Replenium undertook this significant financial burden based on the parties' expectation that when the Replenium Platform was timely launched and expanded nationally, Replenium would receive Service Fees that would compensate it for its work.  Over three years, Albertsons repeatedly encouraged Replenium to continue its work on the Replenium Platform—despite Albertsons' missed deadlines, countless delays, and millions in expenses incurred by Replenium—precisely because Replenium would earn back the amount of its expenses and more through Service Fees.

120.     Albertsons made these statements knowing that they were untrue.  Albertsons' development of the Albertsons Platform laid bare the true goal of Albertsons' insistence that Replenium continue to endure significant development costs.  Albertsons wanted continued access to Replenium's Trade Secrets and other Confidential Information underlying the Replenium Platform so that it could reap the benefit of the MSA, and the information shared under the MNDA and MSA, without having to pay Replenium Service Fees or any compensation for its Trade Secrets and other Confidential Information.

121.     Albertsons has now expanded Schedule & Save under the Albertsons Platform, developed using technology and know-how that it received from Replenium under the MNDA and MSA, across the vast majority of its stores, including some of its largest banners, such as Safeway, Vons, Albertsons, and Jewel-Osco.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

122.   Albertsons misled and unfairly exercised its leverage over Replenium, including through its false and misleading statements about its planned national expansion, to obtain Replenium's Trade Secrets and other Confidential Information while it built its own competing internal solution.  Albertsons knowingly placed Replenium in business distress, without any Service Fees or financial consideration for its use of that information.

## COUNT I

### Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

123.   Replenium incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

124.   Replenium possessed confidential Trade Secrets relating to the Replenium Platform.

125.   Replenium's Trade Secrets consist of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, which were stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing which Replenium has taken reasonable measures to keep secret and which derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the Trade Secrets.

126.   Replenium has expended considerable time, effort, and expense in compiling and developing its Trade Secrets.

127.   Replenium has undertaken reasonable methods to maintain the secrecy of its Trade Secrets, including entering into non-disclosure agreements with any party with whom it shared the information.

128.   Replenium entered into an MNDA with Albertsons, which required Albertsons to safeguard and maintain the confidentiality of Replenium's Trade Secrets.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

129.     Replenium also entered into the MSA with Albertsons, which reaffirmed Albertsons' confidentiality obligations.

130.     Replenium shared its Trade Secrets with Albertsons pursuant to the protections of the MNDA and the MSA.

131.     Albertsons' disclosure or use of Replenium's Trade Secrets has been without the express or implied consent of Replenium where, at the time of the disclosure or use, Albertsons knew or had reason to know—in light of the MNDA and MSA —that its knowledge of Replenium's Trade Secrets was acquired under circumstances giving rise to Albertsons' duty to maintain their secrecy or limit their use.

132.     Albertsons has exploited Replenium's Trade Secrets to the benefit of Albertsons and the detriment of Replenium in order to develop a full-basket auto-replenishment system and unfairly compete with Replenium.

133.     Albertsons' misappropriation of Replenium's Trade Secrets was with knowledge that such action was a breach of its obligations under the MNDA and MSA and its duty to limit its use of the Trade Secrets.  Despite this, Albertsons continued to utilize Replenium's Trade Secrets for its own benefit and endeavors.

134.     Albertsons' misappropriation of Replenium's Trade Secrets was and continues to be reckless and malicious.

135.     As a direct and proximate result of Albertsons' misappropriation of Replenium's Trade Secrets, Replenium has suffered, and continues to suffer, significant damages.

136.     There is no justification for Albertsons' wrongful conduct, which is improper and taken for commercial benefit.  Albertsons' conduct has proximately and directly caused and will continue to cause irreparable harm to Replenium.  Replenium has incurred additional harm in devoting time and resources to undo damage done by Albertsons and to prevent further harm.

137.     Replenium has been damaged as a result of Albertsons' conduct and is entitled to damages in an amount to be proven at trial, as well as exemplary damages, injunctive relief or a

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

reasonable royalty, any unjust enrichment not encompassed in the computation of Replenium's losses, and an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3).

## <u>COUNT II</u>

### **Washington Uniform Trade Secrets Act, R.C.W. § 19.108.010, *et seq.***

138.    Replenium incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

139.    Replenium possessed confidential Trade Secrets relating to the Replenium Platform.

140.    Replenium's Trade Secrets consist of information, including a formula, pattern, compilation, program, device, method, technique or process that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

141.    Replenium has expended considerable time, effort, and expense in compiling and developing the Trade Secrets.

142.    Replenium has undertaken reasonable methods to maintain the secrecy of its Trade Secrets, including entering into non-disclosure agreements with any party with whom it shared the information.

143.    Replenium entered into an MNDA with Albertsons, which required Albertsons to safeguard and maintain the confidentiality of Replenium's Trade Secrets.

144.    Replenium also entered into the MSA with Albertsons, which reaffirmed Albertsons' confidentiality obligations.

145.    Replenium shared its Trade Secrets with Albertsons pursuant to the protections of the MNDA and the MSA.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

146.   Albertsons has exploited Replenium's Trade Secrets to the benefit of Albertsons and the detriment of Replenium in order to develop a full-basket auto-replenishment system, referred to herein as the Albertsons Platform, and unfairly compete with Replenium.

147.   Albertsons' disclosure or use of Replenium's Trade Secrets has been without the express or implied consent of Replenium where, at the time of the disclosure or use, Albertsons knew or had reason to know—in light of the MNDA—that its knowledge of Replenium's Trade Secrets was acquired under circumstances giving rise to Albertsons' duty to maintain their secrecy or limit their use.

148.   Albertsons' misappropriation of Replenium's Trade Secrets was with knowledge that such action was a breach of its obligations under the MNDA and its duty to limit its use of the Trade Secrets.  Despite this, Albertsons continued to utilize Replenium's Trade Secrets for its own benefit and endeavors.

149.   Albertsons' misappropriation of Replenium's Trade Secrets was and continues to be willful and malicious.

150.   As a direct and proximate result of Albertsons' misappropriation of Replenium's Trade Secrets, Replenium has suffered, and continues to suffer, significant damages.

151.   Albertsons' misappropriation of Replenium's Trade Secrets has caused Replenium substantial injury, including, inter alia, actual damages, lost profits, harm to reputation, competitive harm, and diminution in value of its Trade Secrets.

152.   Replenium has been damaged as a result of Albertsons' conduct and is entitled to damages in an amount to be proven at trial, as well as exemplary damages, injunctive relief or a reasonably royalty, any unjust enrichment not encompassed in the computation of Replenium's losses, and an award of attorneys' fees pursuant to R.C.W. § 19.108.030-40.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

## COUNT III

### Breach of the MNDA and the Confidentiality Provisions of the MSA

153.    Replenium incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

154.    Replenium and Albertsons are parties to the MNDA.

155.    The MNDA is a valid and binding contract.

156.    Pursuant to § 4 of the MNDA, Albertsons agreed to only "use Confidential Information solely for the Purpose, and for no other purpose" and to not "export, reverse engineer, disassemble or decompile any prototypes software or other tangible objects that embody the other party's Confidential Information."

157.    "Purpose" pursuant to the MNDA was that "[t]he parties wish[ed] to share information for the purpose of evaluating the suitability of entering into a business relationship or in furtherance of an existing business relationship."  MNDA § 1.

158.    Section 4 of the MNDA also prohibited Albertsons from disclosing the Confidential Information to any of its representatives outside of those who needed to know it for the MNDA's defined Purpose.

159.    Replenium and Albertsons are also parties to the MSA.

160.    The MSA is a valid and binding contract.

161.    The MSA affirms, at section 9.1, that all confidential and proprietary information disclosed by one party to the MSA to the other party "concerning or pertaining to the business of the disclosing party shall be subject to the terms of the [MNDA]."

162.    Further, section 11.3(c) of the MSA provides that "Albertsons will use its reasonable efforts to protect Company's Intellectual Property rights in the Services and will report promptly to Company any infringement or misappropriation of such rights of which Albertsons becomes aware."

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

163.     Section 11.6 of the MSA further provides that "Albertsons will not . . . (b) copy, modify or create any derivative works based on the Services or (c) disassemble, decompile, or reverse engineer the Services or permit any third party to do so."

164.     Albertsons breached the MNDA and MSA by failing to protect Replenium's Confidential Information and misusing Replenium's Confidential Information to create the Albertsons Platform.

165.     Replenium suffered and will continue to suffer substantial damages as a result of these breaches of contract.

**COUNT IV**

**Breach of the MSA**

166.     Replenium incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

167.     Replenium and Albertsons are parties to the MSA.

168.     The MSA is a valid and binding contract.

169.     Under the MSA, and its incorporated SOWs as amended, Albertsons provided a target Commercial Launch date of March 15, 2021.

170.     Commercial Launch was defined in the SOW as "the date mutually agreed to by the parties on which Customers are able to begin placing Replenishment Orders in one or more geographic or segmented markets.  For the sake of clarity, the ability of Customers to place Replenishment Orders as part of a friendly user trial of the Services does not constitute Commercial Launch."  Commercial Launch was further defined in Appendix B to the SOW as "Open service to public, including selected features detailed in Appendix C."

171.     Further, Albertsons agreed to cooperate and assist Replenium in good faith to achieve a nationwide expansion of the Replenium Platform to the public.  Specifically, SOW §1.3 provides: "Cooperation and Assistance. In order to enable Company to provide the Services [Albertsons] will: (a) provide Company with good faith cooperation and access to such

information, facilities, and equipment as reasonably requested by Company from time to time, including, without limitation, providing Albertsons Content, personnel assistance, security access, and software interfaces to the Albertsons Sites; (b) cooperate with Company pursuant to the integration documents to be provided by Company; and (c) carry out in a timely manner all other Albertsons obligations set forth in this Agreement."

172.    SOW §1.6 also requires Albertsons to "maximize the number of Replenishment Orders placed by Customers."

173.    Replenium fulfilled its obligations under the MSA, devoting immense resources and investing significant man-hours and hundreds of thousands of dollars per month, including labor and technical infrastructure costs to provide Albertsons with the automated replenishment SaaS Services and the Replenium Platform.

174.    Albertsons breached the MSA by failing to cooperate with Replenium in good faith to accomplish the purpose of the MSA, failing to timely launch the Replenium Platform, failing to timely carry out its obligations under the MSA, failing to maximize the number of Replenishment Orders placed by its customers, and by diverting its resources toward launching its own auto-replenishment solution while requiring Replenium to continue to invest in a nationwide expansion under the MSA.

175.    Replenium suffered and will continue to suffer substantial damages as a result of this breach of the MSA by Albertsons.

## COUNT V

### Breach of the Implied Covenant of Good Faith and Fair Dealing

176.    Replenium incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

177.    Replenium and Albertsons entered into the MSA.

178.    Every contract contains implied covenants of good faith and fair dealing, which is a presumption that the parties to the contract will deal with each other honestly, fairly, and in good

COMPLAINT AND DEMAND FOR JURY TRIAL - 37
CASE NO. 2:24-CV-1281

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

faith, so as to not destroy the rights of the other party or parties to receive the benefits of the contract.  The implied covenants of good faith and fair dealing also prevent parties from unreasonably exercising discretion pursuant to a contract.

179.    The MSA was agreed upon for the purpose of Albertsons and Replenium working together toward a nationwide expansion of the Replenium Platform, including the full set of service features described in the MSA.

180.    Albertsons had a duty to act in good faith and work toward a nationwide expansion of the Replenium Platform, with a full set of service features, consistent with the purpose of the MSA.

181.    Albertsons destroyed the purpose of the MSA by acting in bad faith to delay the national expansion of the Replenium Platform, failing to incorporate service features specified in the SOW, failing to disclose to Replenium that Albertsons was simultaneously developing its own auto-replenishment platform, failing to protect Replenium's Trade Secrets and other Confidential Information while developing its own auto-replenishment platform, using Replenium's Trade Secrets and other Confidential Information in connection with its development of the Albertsons Platform, and terminating the MSA on the eve of Albertsons' nationwide expansion of the Replenium Platform to deprive Replenium of the benefit of its bargained-for Services Fees.

182.    Albertsons was aware that Replenium would not have entered into, or continued to perform services under the MSA for three years, or shared Trade Secrets and other Confidential Information, had it known that Albertsons would terminate the MSA prior to a nationwide expansion or that Albertsons was planning to launch an internally developed auto-replenishment platform to replace the Replenium Platform.

183.    Albertsons repeatedly and intentionally delayed the launch and national expansion of the Replenium Platform while it used Replenium's Trade Secrets and other Confidential Information it obtained pursuant to the MNDA and MSA to create and launch the Albertsons

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Platform.  In doing so, Albertsons intentionally deprived Replenium of the benefit of the bargain of the MSA.

184.     Replenium suffered and will continue to suffer substantial damages as a result of Albertsons' breach of the implied covenants of good faith and fair dealing.

## COUNT VI

### Promissory Estoppel

185.     Replenium incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

186.     Albertsons repeatedly represented to Replenium that Albertsons would engage in a nationwide expansion of the Replenium Platform in Albertsons' locations across the country and that Replenium would receive Service Fees based on that expansion to compensate it for its losses during Albertsons' contract delays.

187.     Replenium relied on Albertsons' representations that Albertsons would conduct a nationwide expansion of the Replenium Platform.

188.     Replenium's reliance on Albertsons' representations induced Replenium to continue its work on the Replenium Platform beyond its obligations under the MSA and to incur additional substantial costs in order to continue to support the Replenium Platform.

189.     Albertsons specifically represented to Replenium that the Replenium Platform would nationally expand on specific dates, including July 22, 2022 and February 15, 2023, inducing Replenium to incur significant implementation costs in reliance on those representations.

190.     Replenium has suffered significant financial hardship and damages as a result of Albertsons' failure to nationally expand the Replenium Platform.

## COUNT IV

### Unjust Enrichment

191.     Replenium incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

192.     Albertsons obtained a benefit from Replenium in the form of services and confidential information that Replenium was not obligated to provide to Albertsons under any contract.  Through three years of services and information sharing, Albertson received the know-how to build its own auto-replenishment platform.

193.     Replenium invested millions of dollars and countless hours and resources in providing Albertsons with the services and information it required of Replenium, costing Replenium its investment and the opportunity to provides services to and profit from working with other retailers.

194.     If Albertsons had not received the benefit of Replenium's knowledge, information, technology, business logic, and know-how, it would have had to spend significant resources in an attempt create this technology on its own or by paying another third party.  Accordingly, it unjustly avoided costs through the creation of its Albertsons Platform.

195.     Albertsons appreciated, accepted, and retained the benefit it obtained under inequitable and unjust circumstances arising from Albertsons' conduct toward Replenium, including during the time that Albertson was building its own auto-replenishment platform that it knew would deprive Replenium of the opportunity to be compensated for its services and information.

196.     Albertsons profited, and continues to profit, from Replenium's services and information without providing Replenium with just compensation for the benefit received from Replenium.

197.     Under the circumstances, it would be unjust and unfair for Albertsons to be permitted to retain any of the benefits obtained from Replenium without payment to Replenium.

## PRAYER FOR RELIEF

Replenium prays that the Court:

A.     Enter judgment that Albertsons violated the Defend Trade Secrets Act by misappropriating Replenium's Trade Secrets;

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

B.      Enter judgment that Albertsons violated the Washington Uniform Trade Secret Act by misappropriating Replenium's Trade Secrets;

C.      Enter judgment that the MNDA is valid and enforceable, and has been breached by Albertsons, and that Replenium has been damaged as a result of Albertsons' breach;

D.      Enter judgment that the MSA is valid and enforceable, and has been breached by Albertsons, and that Replenium has been damaged as a result of Albertsons' breach;

E.      Enter judgment that Albertsons breached the implied covenant of good faith and fair dealing implied in the MSA, and that Replenium has been damaged as a result of Albertsons' breach;

F.      Enter judgment that Albertsons made promises to Replenium, upon which Replenium reasonably relied to its detriment;

G.      Enter judgment that Albertsons has been unjustly enriched as a result of unjustly avoided costs to build the Albertsons Platform and by reaping the benefit of Replenium's services and information without just compensation;

H.      Award Replenium a monetary judgment against Albertsons in an amount to be determined at trial;

I.      Award Replenium exemplary double damages as authorized by law;

J.      Award Replenium attorneys' fees in such other amounts as may be proven by trial or as otherwise provided by law;

K.      Award Replenium pre- and post-judgment interest; and

L.      Grant such other and further relief as this Court deems just and proper.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1

**JURY TRIAL DEMANDED**

2

Plaintiff hereby demands a trial by jury.

3

4

DATED this 19th day of August, 2024.       **SUMMIT LAW GROUP, PLLC**

5

By _s/ Lawrence C. Locker_
   Lawrence C. Locker, WSBA #15819

6

   Rebecca Singleton, WSBA #57719

7

   315 Fifth Avenue S., Suite 1000
   Seattle, WA  98104-2682

8

   Tel.: (206) 676-7000
   _larryl@summitlaw.com_

9

   _rebeccas@summitlaw.com_

10

**SPIRO HARRISON & NELSON**

11

Jason C. Spiro

12

(_Pro Hac Vice_ application forthcoming)
Meredith Sharoky Paley

13

(_Pro Hac Vice_ application forthcoming)
40 Exchange Place, Suite 1404

14

New York, NY  10005
Tel.: (973) 232-0881

15

Fac.: (973) 232-0887
_jspiro@shnlegal.com_

16

_mpaley@shnlegal.com_

17

_Attorneys for Plaintiff Replenium Inc._

18

19

20

21

22

23

24

25

26

COMPLAINT AND DEMAND FOR JURY TRIAL - 42
CASE NO. 2:24-CV-1281

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001