1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

REPLENIUM INC.,

                        Plaintiff,

    v.

ALBERTSONS COMPANIES, INC.,

                        Defendant.

CASE NO. 2:24-cv-01281-TL

ORDER ON MOTION TO DISMISS

       This is an action for damages for the misappropriation of trade secrets, breach of contract, and other related claims. This matter is before the Court on Defendant Albertsons Companies, Inc.'s Motion to Dismiss. Dkt. No. 22. Having reviewed Plaintiff Replenium Inc.'s response (Dkt. No. 29), Defendant's reply (Dkt. No. 31), and the relevant record, and finding oral argument unnecessary, *see* LCR 7(b)(4), the Court GRANTS IN PART and DENIES IN PART the motion as follows.

## I.    BACKGROUND

The following facts are recited as alleged in the Complaint, in the light most favorable to Plaintiff. *See* Dkt. No. 1 (Complaint); Dkt. No. 29 at 9–16.

### A.    The Parties

Plaintiff is a Washington corporation with its principal place of business in Seattle. Dkt. No. 1 ¶ 18. Plaintiff is a "software-as-a-service ('SaaS') company that provides ground-breaking auto-replenishment services to grocery retailers." *Id.* ¶ 2. Plaintiff's system (the "Replenium Platform") "automatically schedules customers' product replenishment orders and organizes deliveries and pick-ups based on replenishment schedules and customer preferences." *Id.* ¶ 23.

Defendant is a Delaware corporation with its principal place of business in Boise, Idaho. *Id.* ¶ 19. Defendant is the second-largest supermarket chain in North America. *Id.* ¶ 3.

### B.    The Contracts[1]

Defendant sought access to the Replenium Platform. *Id.* ¶ 30. Accordingly, on June 17, 2020, the Parties entered into the Mutual Nondisclosure Agreement ("MNDA"). *Id.* ¶ 31; *see* Dkt. No. 24-3 (MNDA). The MNDA contains the following relevant provisions:

> 1. **Purpose.** The parties wish to share information for the purpose of evaluating the suitability of entering into a business relationship or in furtherance of an existing business relationship ("**Purpose**") and in connection therewith, the disclosing party or its Representatives, hereinafter defined (collectively, "**Disclosing Party**") desires that the receiving party or its Representatives (collectively, "**Receiving Party**") treat such information as confidential. As used in this Agreement, "**Representatives**" shall mean the applicable party's parent, affiliates and subsidiaries, and its and their officers, directors, employees, contractors, consultants, agents and representatives.

---

[1] The contracts are not attached to the Complaint. However, Plaintiff does not object to Defendant's attachment of the contracts to its motion to dismiss. Therefore, the Court will consider the contracts, as they form the basis of Plaintiff's contractual claims and are thus incorporated by reference into the Complaint. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *see also infra* Section III.A.1.

2. "**Confidential Information**" means any and all information of the Disclosing Party and each of its parent, affiliates and subsidiaries that is not available to the public, including, but not limited to; trade secrets; techniques; methods; methodologies; product and manufacturing specifications; purchase or sales volume, manufacturing, marketing, development, customer (personal and aggregate data, including household and alternative IDs and tracking cookies and tags), employee, supplier, financial or operations information; technical, scientific, laboratory, experimental, research or statistical data; tooling; machinery; diagrams; drawings; forecasting; business and new product and service plans; reports; procedures; designs; formulae; recipes; improvements; records; processes; any and all current and future product information; facilities tours; know-how; data or any third party information and contracts that Disclosing Party is obligated to treat as confidential that is disclosed or made accessible to the Receiving Party directly or indirectly, in any form, whether written, oral, photographic, electronic, magnetic, computer, by inspection of tangible objects, or otherwise (including materials, records, reports, documents, prototypes, samples, plant and equipment) and information that has been subject to confidential treatment under a terminated or expired agreement between the parties. . . .

4. **Non-use and Non-disclosure**. The Receiving Party agrees: (i) to use Confidential Information solely for the Purpose, and for no other purpose; (ii) not to disclose any Confidential Information except as expressly permitted by, or to enforce, this Agreement and (iii) to disclose Confidential Information only to its Representatives who need to know the Confidential Information for the Purpose and who are bound to keep such Confidential Information confidential consistent with the obligations of this Agreement. Neither party shall export, reverse engineer, disassemble or decompile any prototypes, software or other tangible objects that embody the other party's Confidential Information. . . .

6. **Maintenance of Confidentiality**. The Receiving Party agrees that it shall take commercially reasonable measures to protect the secrecy of, and to prevent unauthorized disclosure and/or use of, the Confidential Information of the Disclosing Party. Without limiting the foregoing, each party shall take at least those measures that it takes to protect its own confidential information of similar import. . . .

11. **Term**. The term of this Agreement commences on the Effective Date and continues until terminated by the parties in

writing, provided, that each party's confidentiality obligations shall survive such termination until such time as the Confidential Information of the other party disclosed pursuant to this Agreement becomes publicly known and made available through no breach of this Agreement by the Receiving Party ("**Public Information**''). . . .

Dkt. No. 24-3 (boldface in original).

On October 7, 2020, the Parties entered into the Master Services Agreement ("MSA"), along with a Statement of Work ("SOW") that was incorporated into the MSA. Dkt. No. 1 ¶ 36; Dkt. No. 24-4 (MSA); Dkt. No. 24-1 (SOW with Appendices A–C).

The MSA contains the following relevant provisions:

**1. Services/Deliverables.** . . . Notwithstanding any other provision to the contrary in this Agreement, the parties acknowledge that Company is providing automated replenishment SaaS Services and that Company will not be producing any Deliverables except as expressly set forth in an SOW. . . .

**9.1 Confidential Information.** Any and all confidential and proprietary information disclosed by a party hereto to the other party, whether disclosed electronically, orally in writing, or by display which is not generally disclosed to or known by the public, concerning or pertaining to the business of the disclosing party shall be subject to the terms of the Mutual Non-Disclosure Agreement between the parties, dated June 17, 2020 ("NDA"). . . .

**6.1 Payment Terms.** In consideration for the timely and full performance of Services and upon acceptance of the applicable Deliverables (as defined in the applicable SOW), Albertsons agrees to pay Company the Fees specified in such SOW. . . .

**11.2 Company Rights.** As between Albertsons and Company, Company is deemed to own (i) Company's Preexisting Intellectual Property and any modifications, derivatives or improvements it makes thereto; and (ii) any new Intellectual Property it creates independent of its performing the Services or delivering the Deliverables that, in case of both (i) and (ii) above: (a) do not contain Albertsons' Preexisting Intellectual Property or Albertsons' Intellectual Property or any derivative works thereof; or (b) do not use, include or refer to Albertsons Confidential Information.

**11.3 License Grants.** . . . (c) . . . Albertsons will use its reasonable efforts to protect Company's Intellectual Property rights in the Services and will report promptly to Company any infringement or misappropriation of such rights of which Albertsons becomes aware. . . .

**11.6 Reservation of Rights.** Company owns all rights, title and interests in and to the Services and all the Intellectual Property rights therein. Nothing in this Agreement will be deemed to assign, grant or convey to Albertsons any ownership interests in the Services. Albertsons will not (a) license, sublicense, sell, rent, loan, distribute, assign, transfer or otherwise make available the Services to any third party (b) copy, modify or create any derivative works based on the Services or (c) disassemble, decompile, or reverse engineer the Services or permit any third party to do so. . . .

Dkt. No. 24-4 (boldface in original).

The SOW contains the following relevant provisions:

**1.1 Definitions:** . . .

(c) **"Commercial Launch"** means the date mutually agreed to by the parties on which Customers are able to begin placing Replenishment Orders in one or more geographic or segmented markets. For the sake of clarity, the ability of Customers to place Replenishment Orders as part of a friendly user trial of the Services does not constitute Commercial Launch. . . .

(e) **"Fees"** mean the Implementation Fees, the Service Fees and any license or other fees as set forth in Appendix A. . . .

**1.3 Cooperation and Assistance.** In order to enable Company to provide the Services Company will: (a) provide Company with good faith cooperation and access to such information, facilities, and equipment as reasonably requested by Company from time to time, including, without limitation, providing Albertsons Content, personnel assistance, security access, and software interfaces to the Albertsons Sites; (b) cooperate with Company pursuant to the integration documents to be provided by Company; and (c) carry out in a timely manner all other Albertsons obligations set forth in this Agreement. . . .

**1.6 Promotion.** The parties acknowledge that upon Commercial Launch it is in their mutual interest to maximize the number of Replenishment Orders placed by Customers. To that end, Albertsons will use commercially reasonable efforts to market and

promote the ability of Customers to place and manage
Replenishment Orders. . . .

Dkt. No. 24-1 (boldface and underscore in original). Under "Deliverables" and "Schedule for

Deliverables," the SOW states "N/A." *Id.* at 2. Under "Schedule for Milestones," the SOW states

in relevant part, "Final Acceptance Date: December 31, 2020 target Commercial Launch or such

other date as mutually agreed in writing." *Id.*

      "Pursuant to Appendix A of the SOW, [Defendant] agreed to 'pay [Plaintiff] a percentage

Service Fee based upon Net Revenue generated through Replenishment Orders' in accordance

with a tiered payment structure." Dkt. No. 1 ¶ 40 (quoting Dkt. No. 24-1 at 7). Pursuant to

Appendix B, "Friendly User Trial, Measurement & Iteration" was described as "Open program

to a small but expanding number of stores, products and customers." Dkt. No. 24-1 at 8.

"Commercial Launch" was described as "Open service to public, including selected features

detailed in Appendix C." *Id.*

## C.    The Parties' Relationship

      In July 2020, pursuant to the MNDA and MSA, the Parties began collaborating and

sharing trade secrets and other confidential information. Dkt. No. 1 ¶ 50. The Parties were in

regular contact about the Replenium Platform and its underlying technology, including "the

underlying system architecture, integration details and processes, as well as strategic approaches

to implementation and business logic." *Id.* ¶ 51. By October 2020, the Parties were holding

weekly meetings. *Id.* ¶ 52. The Parties frequently communicated through messaging services,

emails, PowerPoint presentations, and video and phone meetings. *Id.* ¶¶ 54–64. Plaintiff shared its

trade secrets and confidential information with more than 200 of Defendant's employees. *Id.* ¶ 53.

      In this process, "[Defendant] consistently sought information about the Replenium

Platform, under the MNDA and MSA, far beyond what was necessary" for integration. *Id.* ¶ 66.

"Defendant sought information that went to the core of the operation of the Replenium

Platform," including trade secrets and confidential information. *Id.*; *see also id.* ¶¶ 100–101.

Plaintiff asserts it "has never shared this depth of information with prospective customers, even

when an NDA is in place." *Id.* ¶ 65. But Plaintiff shared all the above information with

Defendant based on the protections of the MNDA and MSA. *Id.* ¶¶ 65–66.

Among the information Plaintiff shared with Defendant was Plaintiff's Application

Programming Interface ("API") and Software Development Kit ("SDK") documentation,

including a document containing its API endpoints. *Id.* ¶¶ 61–62. Defendant also required that all

API traffic be transmitted through its servers, allowing Defendant to gain more information

about Plaintiff's technology. *Id.* ¶ 63.

**D.    Delays and Defendant's Own Platform**

Defendant did not meet the December 31, 2020, date for the Commercial Launch. *Id.*

¶ 67. Plaintiff agreed to extend the date to March 31, 2021. *Id.* ¶¶ 67–68; *see* Dkt. No. 24-5 at 2.

Defendant also failed to meet that date. *Id.* ¶ 69.

Over time, Defendant made repeated promises to carry out a nationwide expansion. *See*

*id.* ¶¶ 73, 75–76, 78–79, 84. Instead of launching a nationwide expansion as promised, however,

Defendant launched multiple limited pilots of the Replenium Platform. *Id.* ¶¶ 70–71; *see also id.*

¶¶ 72, 79–80, 105–106. The pilots demonstrated the functionality of the platform. *Id.* Plaintiff

incurred significant financial losses as a result of the delays. *Id.* ¶¶ 70, 77, 82.

As Defendant was working with Plaintiff, Defendant began covertly developing a near-

identical platform (the "Albertsons Platform"). *Id.* ¶ 93. Defendant did not inform Plaintiff of

this work, nor did it take any apparent precautions to protect Plaintiff's trade secrets and

confidential information. *Id.* ¶ 94. In the months before to Defendant's launch of the Albertsons

Platform and its termination of the MSA, Defendant continued to seek information from Plaintiff

1  about the Replenium Platform. *Id.* ¶¶ 95, 100–103. Defendant also sought to amend the MNDA

2  to include a "Residuals" clause that would permit its use of "residuals" of confidential

3  information, including "information retained in the memories of its representatives who had

4  access to [Plaintiff's] information," but Plaintiff rejected the proposal. *Id.* ¶¶ 97–99.

**E.    Termination of the MSA**

6      On October 3, 2023, Defendant terminated the MSA. *Id.* ¶ 107. Defendant stated that it

7  would continue "Schedule & Save" (Defendant's product developed with Plaintiff and operated

8  on the Replenium Platform (*id.* ¶¶ 7, 11, 14)) with "internal functionality." *Id.* ¶ 111. Plaintiff

9  soon learned that Defendant had been developing the Albertsons Platform while still receiving

10  Plaintiff's trade secrets and confidential information. *Id.* ¶ 112.

11      On October 18, 2023, Defendant launched the Albertsons Platform "with a design and

12  functionality that is strikingly similar to the Replenium Platform." *Id.* ¶ 116.

**II.    LEGAL STANDARD**

14      A defendant may seek dismissal when a plaintiff fails to state a claim upon which relief

15  can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion to dismiss, the

16  Court takes all well-pleaded factual allegations as true and considers whether the complaint

17  "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

18  (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "[t]hreadbare

19  recitals of the elements of a cause of action, supported by mere conclusory statements," are

20  insufficient, a claim has "facial plausibility" when the party seeking relief "pleads factual content

21  that allows the court to draw the reasonable inference that the defendant is liable for the

22  misconduct alleged." *Iqbal*, 556 U.S. at 672. When reviewing a dismissal pursuant to

23  Rule 12(b)(6), "'we accept as true all facts alleged in the complaint and construe them in the

24  light most favorable to plaintiff[ ], the non-moving party.'" *DaVinci Aircraft, Inc. v. United*

1    *States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (alteration in original) (quoting *Snyder & Assocs.*

2    *Acquisitions LLC v. United States*, 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

3                                 **III.    DISCUSSION**

4    **A.    Materials Outside the Pleadings**

5            As an initial matter, Defendant supplies a declaration in support of its motion, to which it

6    attaches several exhibits for the Court's consideration. *See* Dkt. Nos. 23, 24 (sealed). In its

7    motion, Defendant also cites various public websites for the Court's consideration. *See generally*

8    Dkt. No. 22. Plaintiff objects to the consideration of many of these materials at this stage of the

9    case. *See* Dkt. No. 29 at 16–19.

10           On a motion to dismiss, a court may "consider certain materials—documents attached to

11   the complaint, documents incorporated by reference in the complaint, or matters of judicial

12   notice—without converting the motion to dismiss into a motion for summary judgment." *United*

13   *States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). Defendant argues that certain "presentations,

14   emails, and messages" discussed in the Complaint, as well as the Parties' April 7, 2022, email

15   exchange and attachments, are all incorporated by reference. *See* Dkt. No. 31 at 7–8. Defendant

16   further argues that the "patents and public websites" it cites are subject to judicial notice. *See id.*

17   at 8–9. The Court first considers whether it *may* consider the identified materials on this motion

18   before deciding whether it *will* consider them.

19           **1.    Incorporation by Reference**

20           Under the doctrine of incorporation by reference, a court may "consider documents in

21   situations where the complaint necessarily relies upon a document or the contents of the

22   document are alleged in a complaint, the document's authenticity is not in question and there are

23   no disputed issues as to the document's relevance." *Coto Settlement v. Eisenberg*, 593 F.3d 1031,

24   1038 (9th Cir. 2010); *see also Ritchie*, 342 F.3d at 908 (holding a document is incorporated by

reference "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim"). "But the mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Coto Settlement*, 593 F.3d at 1038. In addition, "if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "Although the incorporation by reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id.* at 1003. Finally, a court "may, but is not required to incorporate documents by reference." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1159 (9th Cir. 2012).

### a.    *Presentations with Related Emails & Messages*

Plaintiff argues that the presentations (and related emails and messages) are not "extensively" referenced in the Complaint, and that even if they are incorporated, the Court "should not examine the substance" of the presentations to determine if they contain trade secrets. *See* Dkt. No. 29 at 18–19; *see also* Dkt. Nos. 24-2 (Ex. 2, June 2020 "Tech Overview" presentation), 24-10 (Ex. 12, September 2020 email and slides), 24-11 (Ex. 13, September 2022 email and slides), 24-12 (Ex. 16, September 2020 slides), 24-13 (Ex. 17, "Replenium SDK for iOS"), 24-14 (Ex. 18, "Replenium API End-Points"), 24-15 (Ex. 19, emails), 24-16 (Ex. 20, Slack messages), In response, Defendant argues that the presentations form the basis of the Complaint, and that Plaintiff does not dispute their accuracy. *See* Dkt. No. 31 at 7–8.

The Court may consider the presentations and related materials as they are incorporated by reference. Even though each individual presentation is not cited repeatedly, the presentations and materials collectively form the basis of Plaintiff's claims that trade secrets and confidential information were shared with (and later misappropriated or misused by) Defendant. *See* Dkt.

No. 1 ¶¶ 50–66; *see also AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904, 912–913 (N.D. Cal. 2022) (incorporating by reference exhibits "referenced only once or twice" that "serve to form the basis of Plaintiff's claim"). Moreover, Plaintiff does not dispute their authenticity or relevance. *See Coto Settlement*, 593 F.3d at 1038.

### b.    *April 7 Email Exchange & Attachments*

Plaintiff argues that the April 7, 2022, email exchange and attachments are used to create a defense and do not form the basis of the Complaint. *See* Dkt. No. 29 at 19; *see* Dkt. No. 24-9 (Exhibit 11). In response, Defendant argues that Plaintiff "extensively references" disputes over payments and a failed nationwide expansion, all of which the emails address. Dkt. No. 31 at 8.

The Court may not consider the April 7 email exchange. While Plaintiff alleges that it "shared its financial information" with Defendant and makes further allegations regarding Defendant's performance under the contracts, Plaintiff does not once mention this email exchange, let alone refer to these emails extensively, and they do not necessarily form the basis of any claim. Instead, the email exchange "merely creates a defense" to Plaintiff's allegations. *Khoja*, 899 F.3d at 1002. Indeed, Defendant states that the materials "*go[ ] directly*" to Plaintiff's assertions (Dkt. No. 31 at 8 (emphasis in original)) before proceeding to explain why the content of the materials counters Plaintiff's allegations (*see id.*). These materials are properly presented at summary judgment, not at the pleadings stage.

### 2.    Judicial Notice

Under Federal Rule of Evidence 201, a trial court may take judicial notice of adjudicative facts that are "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a), (b); *accord Jespersen v. Harrah's Operating Co., Inc.*, 444 F.3d 1104, 1110 (9th Cir. 2006) (en banc) (quoting Fed. R.

1    Evid. 201(b)). "Adjudicative facts are simply the facts of the particular case." Fed. R. Evid. 201

2    advisory committee's note (1972). As with incorporation by reference, a court may, but is not

3    required to, take judicial notice of materials. *See Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d

4    1005, 1016 n.9 (9th Cir. 2012) (noting that a court "may" take judicial notice and reviewing the

5    district court's decision for abuse of discretion).

6                    **a.    *Patents***

7            Plaintiff argues that the Court should not take judicial notice of "patent applications" or

8    "prior art" because the Court would be required to engage in an improper evaluation of those

9    materials to make a substantive determination. Dkt. No. 29 at 18; *see* Dkt. Nos. 23-2 (Ex. 9, the

10   '831 Patent application), 23-3 (Ex. 10, the '370 Patent), 23-5 (Ex. 14, the Stowe Patent

11   application), 23-6 (Ex. 15, the Fredrich Patent application). In response, Defendant argues that

12   patents can be judicially noticed and should be here. *See* Dkt. No. 31 at 8–9.

13           The Court may take judicial notice of the patents, as they are "matters of public record

14   and the proper subject of judicial notice." *Novation Sols., Inc. v. Issuance, Inc.*, No. C23-696,

15   2023 WL 5505908, at *4 (C.D. Cal. June 27, 2023) (quoting *MACOM Tech. Sols. Inc. v.*

16   *Litrinium, Inc.*, No. C19-220, 2019 WL 4282906, at *1 (C.D. Cal. June 3, 2019)); *see also, e.g.*,

17   *Masimo Corp. v. Apple Inc.*, No. C20-48, 2021 WL 925885, at *2 (C.D. Cal. Jan. 6, 2021)

18   (taking judicial notice of documents "filed with or by the United States Patent and Trademark

19   Office"). However, the Court would limit the notice it takes to "the content of the application[s]

20   and the fact that [they are] available to the public." *Novation Sols.*, 2023 WL 5505908, at *4.

21   Further, the Court would not take notice or intend to imply in any way a finding that "the

22   application[s] disclosed [Plaintiff's] trade secrets." *Id.* The Court would also not "draw

23   inferences or take notice of facts that might reasonably be disputed." *United States v. Corinthian*

24   *Colls.*, 655 F.3d 984, 999 (9th Cir. 2011).

### b.    *Websites*

Plaintiff does not appear to substantively address whether websites can be judicially noticed, citing authorities related only to patents and making only a passing reference to "information contained on websites." *See* Dkt. No. 29 at 17–18; *see also, e.g.*, Dkt. No. 23-8 (Ex. 21, article). For its part, Defendant argues that websites can be judicially noticed and should be here. *See* Dkt. No. 31 at 8–9.

The Court may take judicial notice of the websites cited in Defendant's motion (*see* Dkt. No. 22 at 16–23), as Plaintiff does not dispute their accuracy or public availability. *See, e.g.*, *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014) (noting that "[p]roper subjects of judicial notice" include "publicly accessible websites"); *Ah-Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 869 (N.D. Cal. 2022) (taking judicial notice of publicly accessible webpages). Specifically, the Court would take notice of "the information in these exhibits and of their public availability, but it [would] not take notice that the exhibits contain [Plaintiff's] trade secrets." *Novation Sols.*, 2023 WL 5505908, at *4. The Court would also not "draw inferences or take notice of facts that might reasonably be disputed." *Corinthian Colls.*, 655 F.3d at 999.

### 3.    Whether to Consider the Materials

As explained above, the Court may consider the presentations and related materials, the patent documents, and the websites—but it is not *required* to do so. *See Davis*, 691 F.3d at 1159; *Skilstaf*, 669 F.3d at 1016 n.9. Here, the Court will exercise its discretion to decline to consider the materials proffered by Defendant. After careful review, the Court is unable to determine if Plaintiff's alleged trade secrets are publicly disclosed in the materials. Indeed, other than a few figures identified in the patent documents (which are themselves difficult to assess and compare without additional briefing), Defendant frequently gestures at entire documents and makes sweeping assertions about their contents--without pincites, any meaningful explanation of how

any particular contents of those documents map onto Plaintiff's alleged trade secrets, or how the documents demonstrate that the allegations are inaccurate or untrue. It does not suffice to throw spaghetti at the wall and see what sticks. *See, e.g.*, *T-Mobile USA, Inc. v. Huawei Device USA, Inc.*, 115 F. Supp. 3d 1184, 1192 (W.D. Wash. 2015) (noting that "the court is in no position on a motion to dismiss to sift through patent applications and discern whether they fully disclose everything" about the alleged trade secrets). These materials are more properly presented at the summary judgment stage.

Therefore, the Court exercises its discretion and declines to consider Defendant's materials outside the pleadings.

**B.    Misappropriation of Trade Secrets**

Plaintiff brings claims for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (Dkt. No. 1 ¶¶ 123–137), and the Washington Uniform Trade Secrets Act ("WUTSA"), RCW 19.108 (Dkt. No. 1 ¶¶ 138–152). Defendant primarily argues that Plaintiff fails to identify a protectable trade secret. *See* Dkt. No. 22 at 16–23. Defendant also briefly argues that Plaintiff fails to allege misappropriation of any purported trade secrets. *See id.* at 23–24. The Court considers each argument in turn.

**1.    Identification**

The DTSA defines "trade secret" as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and

1

2

> (B) the information derives independent economic value,
> actual or potential, from not being generally known to, and
> not being readily ascertainable through proper means by,
> another person who can obtain economic value from the
> disclosure or use of the information.

3

4

18 U.S.C. § 1839(3); *see also* 18 U.S.C. § 1836(b)(1) (creating private right of action).

5

Similarly, the WUTSA defines trade secret as

6

7

> information, including a formula, pattern, compilation, program,
> device, method, technique, or process that:

8

> (a) Derives independent economic value, actual or
> potential, from not being generally known to, and not being
> readily ascertainable by proper means by, other persons
> who can obtain economic value from its disclosure or use;
> and

9

10

> (b) Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

11

12

RCW 19.108.010(4); *see also* RCW 19.108.030–.040 (establishing remedies).

13

"Under either statute, '[t]herefore, the definition of trade secret consists of three elements:

14

(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has

15

attempted to keep secret.'" *Genasys Inc. v. Vector Acoustics, LLC*, 638 F. Supp. 3d 1135, 1151

16

(S.D. Cal. 2022) (analyzing DTSA and California's version of the Uniform Trade Secrets Act,

17

substantially similar to the WUTSA) (quoting *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978

18

F.3d 653, 657 (9th Cir. 2020)). "Although the complaint need not 'spell out the details of the trade

19

secret,' a plaintiff seeking relief for trade secret misappropriation must identify the trade secret

20

'with sufficient particularity . . . to permit the defendant to ascertain at least the boundaries within

21

which the secret lies.'" *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1178

22

(W.D. Wash. 2019) (quoting *SMS Signature Cars v. Connects Mktg. LLC*, No. C12-1300, 2012

23

WL 12893935, at *2 (C.D. Cal. Oct. 29, 2012)). "The relevant portions of the DTSA and

24

[W]UTSA are almost identical," and thus they can be analyzed together. *Id.*

This Court has held that "*at the motion to dismiss stage*, 'a plaintiff should not be compelled to divulge with specificity all of its possible trade secrets . . . in order to proceed to discovery.'" *RealD Spark LLC v. Microsoft Corp.*, No. C22-942, 2023 WL 3304250, at *3 (W.D. Wash. May 8, 2023)[2] (emphasis in original) (quoting *T-Mobile USA, Inc. v. Huawei Device USA, Inc.*, 115 F. Supp. 3d 1184, 1193 (W.D. Wash. 2015)); *accord Silver Fern Chem., Inc. v. Lyons*, No. C23-775, 2023 WL 8775478, at *6 (W.D. Wash. Dec. 19, 2023). "In a trade secret case, a plaintiff should not be expected to publicly disclose the details that would expose—and therefore, destroy—the trade secret in order to begin a case. Therefore, it is ordinarily sufficient for a plaintiff to provide descriptions of the categories of the asserted trade secrets in a complaint." *RealD*, 2023 WL 3304250, at *3 (citing The Sedona Conference, *The Sedona Conference Commentary on the Proper Identification of Asserted Trade Secrets in Misappropriation Cases*, 22 Sedona Conf. J. 223, 248 (2021)). With these principles in mind, the Court now addresses the Parties' arguments.

Defendant argues that Plaintiff has not pleaded a protectable trade secret for two reasons: (1) Plaintiff does not identify any trade secret with "sufficient particularity" or "specificity"; and (2) the information pointed to by Plaintiff has been publicly disclosed and thus is not a protectable trade secret. *See* Dkt. No. 22 at 17–23. In response, Plaintiff argues that it has alleged its trade secrets with sufficient particularity (*see* Dkt. No. 29 at 20–22), and that its trade secrets are protectable (*see id.* at 22–25). The Court considers each argument in turn.

---

[2] Defendant cites *RealD* to support the proposition that courts require plaintiffs to identify trade secrets with sufficient particularity, quoting this Court as saying "a plaintiff could 'allege theft of trade secrets with vagueness' and then use discovery from a defendant's files to 'cleverly specify whatever happens to be there' as stolen trade secrets." Dkt. No. 31 at 10. While selectively quoting form this Court's prior Order, Defendant neglected to explain that the Order addressed a motion to compel and its caution about the difference between what is required at the motion-to-dismiss stage versus once a case has moved forward into discovery.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### a.    *Particularity*

Defendant argues that the Complaint uses "vague, technical buzzwords" that are "a near copy-and-paste" of the DTSA and WUTSA definitions of trade secrets. Dkt. No. 22 at 17–18 (citing Dkt. No. 1 ¶¶ 125, 140). But in response, Plaintiff argues that its trade secrets are identified with sufficient particularity in Paragraphs 22–29, 55–65, and 100–101 of the Complaint, not Paragraphs 125 and 140. Dkt. No. 29 at 20.

The Court finds that, at this stage, Plaintiff has pleaded its trade secrets with sufficient particularity. Plaintiff explains that "[its] trade secrets consist of 'technology and business logic' that 'enable customers to automate large portions of their everyday purchases by making it simple for them to identify and add items to their auto-replenishment list,' 'automatically create orders, tender payment, [and] schedule orders for delivery or pick-up when products are due to be replenished.'" *Id.* at 20–21 (quoting Dkt. No. 1 ¶ 24); *see also* Dkt. No. 1 ¶ 23 (alleging Plaintiff was the "first company to successfully create a full-basket auto-replenishment system" that "goes far beyond traditional product subscription platforms"). Plaintiff alleges that it shared with Defendant its API and SDK information and information needed to use the API; details of the product subscription processes and process flowcharts for Cart & Checkout feature; information on how to best design customer experience; and the interaction between customers' and Replenium Platform's inputs that is required to enable auto-replenishment and cart management. *Id.* ¶¶ 58–62. Plaintiff also alleges that it shared the business logic behind the ordering process for existing customers using Cart & Checkout. *Id.* ¶¶ 100–101. These descriptions are not simply buzzwords pulled from statutes; they "are sufficient to permit Defendant[ ] to ascertain the boundaries within which the trade secrets lie." *Silver Fern Chem.,* 2023 WL 8775478, at *6 (citing *Bombardier,* 383 F. Supp. 3d at 1178).

1

### b.   *Protectability*

2   The bulk of Defendant's argument is that even if Plaintiff's trade secrets are sufficiently

3   identified, they are nevertheless not protectable because they are obvious or publicly known. *See*

4   Dkt. No. 22 at 18–23. In response, Plaintiff argues Defendant "cherry-pick[s]" information from

5   its exhibits, which is beside the point when even public information can be developed or

6   combined into a trade secret. *See* Dkt. No. 29 at 23. Plaintiff further argues that APIs and SDKs

7   are protectable (*see id.* at 24), and that this inquiry is improper at the motion-to-dismiss stage

8   (*see id.* at 24–25).

9   The Court finds that, at this stage, Plaintiff has sufficiently pleaded that its trade secrets

10   are protectable and not publicly known. As discussed above, *see supra* Section III.A.3, the Court

11   declines to consider Defendant's proffered materials outside the pleadings. As these materials

12   form the entire basis of Defendant's argument that the trade secrets are obvious or publicly

13   known, the argument fails. Moreover, even if one piece or another of Plaintiff's allegations were

14   publicly known, that fact would not necessarily be fatal to Plaintiff's claims, given that "a trade

15   secret may consist of a compilation of data, public sources or a combination of proprietary and

16   public sources." *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016). Even as Plaintiff's

17   complaint acknowledges potential competitors (*see, e.g.*, Dkt. No. 1 ¶ 29), Plaintiff still alleges

18   that its system "goes far beyond traditional subscription platforms" (*id.* ¶ 23); that "[t]o date, no

19   other grocery retailer . . . has launched a comparable auto-replenishment solution" (*id.*); and that

20   no competitor has succeeded in creating a system like its own (*see id.* ¶¶ 24–28). Defendant's

21   arguments are better presented on a motion for summary judgment, where the Court will have

22   the benefit of a complete evidentiary record, expert analysis, and full briefing.

23

24

1          2.      **Misappropriation**

2          Under both the DTSA and WUTSA, trade secret "misappropriation" is defined as the

3  "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the

4  trade secret was acquired by improper means," 18 U.S.C. § 1839(5)(A), RCW 19.108.010(2)(a),

5  or the "[d]isclosure or use of a trade secret of another without express or implied consent" where

6  the trade secret was acquired through improper means or a duty existed to keep the trade secret

7  confidential, 18 U.S.C. § 1839(5)(B), RCW 19.108.010(2)(b). Misappropriation may be proven

8  by "circumstantial as well as direct evidence." *Brocade v. Commc'ns Sys., Inc. v. A10 Networks,*

9  *Inc.*, 873 F. Supp. 2d 1192, 1215–1216 (N.D. Cal. 2012) (citing *UniRAM Tech., Inc. v. Taiwan*

10  *Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007)); *see also Modumetal, Inc.*

11  *v. Xtalic Corp.*, 4 Wn. App. 2d 810, 824, 425 P.3d 871 (2018) ("Misappropriation of trade

12  secrets can be notoriously difficult to prove: . . . 'In most cases plaintiffs must construct a web of

13  perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences

14  which convince him that it is more probable than not that what plaintiffs allege happened did in

15  fact take place.'" (quoting *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1231 (W.D.N.Y. 1994))).

16          Defendant argues that under the MSA, Defendant "owns the materials [Plaintiff] alleges

17  as trade secrets." Dkt. No. 22 at 23 (citing Dkt. No. 24-4 §§ 11.3(a), 11.3(c), 11.4). Defendant

18  also argues that Plaintiff's allegations are circumstantial and insufficient to establish

19  misappropriation. *See id.* at 23–24. In response, Plaintiff argues the MSA does not entitle

20  Defendant to ownership of the trade secrets (*see* Dkt. No. 29 at 26–28), and that the allegations

21  in its Complaint are sufficient to establish misappropriation (*see id.* at 25–26).

22          The Court finds that, at this stage, Plaintiff has sufficiently pleaded misappropriation of

23  trade secrets. First, the MSA does not, at a minimum, clearly entitle Defendant to ownership of

24  the alleged trade secrets. Section 11.2 of the MSA protects Plaintiff's ownership of its

1    "Preexisting Intellectual Property" (presumably inclusive of any alleged trade secrets) "and any

2    modifications, derivatives or improvements it makes thereto," while Section 11.6 prohibits

3    Defendant from "copy[ing], modify[ing] or creat[ing] any derivative works" based on Plaintiff's

4    services. Dkt. No. 24-4 §§ 11.2, 11.6. There is no allegation that Plaintiff created *new* intellectual

5    property or deliverables for Defendant such that Sections 11.3 or 11.4 would entitle Defendant to

6    ownership. Second, Plaintiff has sufficiently alleged circumstances from which a factfinder

7    could infer misappropriation: Allegedly, Plaintiff shared alleged trade secrets with Defendant

8    (*see* Dkt. No. 1 ¶¶ 50–66, 81, 101–103, 130, 145), and Defendant developed a near-identical

9    platform, concealed that effort, and launched its own platform just 15 days after terminating its

10    contract with Plaintiff (*see id.* ¶¶ 110–112, 114–117).

11                                  *    *    *

12          Therefore, as to Plaintiff's claims for misappropriation of trade secrets, Defendant's

13    motion is DENIED.

14    **C.    Breach of Contract**

15          Plaintiff brings two claims for breach of contract. First, Plaintiff alleges that Defendant

16    breached the confidentiality provisions of the MNDA and the MSA. *See* Dkt. No. 1 ¶¶ 153–165.

17    Second, Plaintiff alleges that Defendant breached certain provisions of the MSA related to

18    commercial performance. *See id.* ¶¶ 166–175. Defendant moves to dismiss both claims; the

19    Court considers each claim in turn.

20          As an initial matter, the Parties agree that the MNDA is governed by Idaho law and the

21    MSA by Delaware law. *Compare* Dkt. No. 22 at 24–25, *with* Dkt. No. 29 at 28; *see also* Dkt.

22    No. 24-3 § 14; Dkt. No. 24-4 § 18.5. Under the law of both states, Plaintiff must allege the

23    existence of a contract, the breach of that contract, and damages. *See Path to Health, LLP v.*

24

*Long*, 383 P.3d 1220, 1227 (Idaho 2016); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

## 1. Confidentiality (MNDA & MSA)

Plaintiff alleges that Defendant breached Section 4 of the MNDA and Sections 9.1, 11.3(c), and 11.6 of the MSA "by failing to protect [Plaintiff's] Confidential Information and misusing [Plaintiff's] Confidential Information to create the Albertsons Platform." Dkt. No. 1 ¶ 164.

Defendant argues that this claim fails for substantially the same reason that the trade secret claims fail—namely, that Plaintiffs fail to allege the disclosure of any confidential information or the misuse of that information by Defendant. *See* Dkt. No. 22 at 24–25; Dkt. No. 31 at 24. In response, Plaintiff argues that the claim survives for the same reasons its trade secret claims survive. *See* Dkt. No. 29 at 28–29. Plaintiff also argues that the contractual protections for confidential information "applied to all non-public information [Plaintiff] disclosed to [Defendant], regardless of whether that information rose to the level of a trade secret." *Id.* at 29. As discussed above, *see supra* Section III.B, Plaintiff has sufficiently pleaded its claims for misappropriation of trade secrets; thus, the Court finds that this claim also survives.

Therefore, as to Plaintiff's claim for breach of the confidentiality provisions of the MNDA and MSA, Defendant's motion is DENIED.

## 2. Commercial Performance (MSA)

Plaintiff alleges that Defendant breached the MSA by violating Sections 1.3 and 1.6 of the SOW, as well as by failing to meet the Commercial Launch date. *See* Dkt. No. 1 ¶ 174. Specifically, Plaintiff alleges that Defendant breached the MSA

> by failing to cooperate in good faith with [Plaintiff] to achieve the purpose of the MSA, failing to timely launch the Replenium Platform, failing to timely carry out its obligations under the MSA,

failing to maximize the number of Replenishment Orders placed
by its customers, and by diverting its resources toward launching
its own auto-replenishment solution while requiring [Plaintiff] to
continue to invest in a nationwide expansion under the MSA.

*Id.* The Court considers each of Defendant's arguments against this claim.

### a.    *Nationwide Expansion*

Plaintiff alleges that one purpose of the MSA was "to cooperate and assist Replenium in good faith to achieve a nationwide expansion of the Replenium Platform to the public." Dkt. No. 1 ¶ 171. Defendant argues that the MSA does not require a nationwide expansion but rather a launch of services "in one or more geographic or segregated markets." Dkt. No. 22 at 25 (quoting Dkt. No. 24-1 § 1.1(c)). In response, Plaintiff appears not to argue that a nationwide expansion was required, which Defendant points out (*see* Dkt. No. 31 at 14); instead, Plaintiff argues that Defendant did not carry out a "Commercial Launch" as defined in the MSA. *See infra* Section III.C.2.b. Therefore, to the extent that Plaintiff alleges a breach for failure to carry out a nationwide expansion, Defendant's motion is GRANTED, and that portion of the breach of contract claim is DISMISSED without leave to amend, as amendment would be futile.

### b.    *Commercial Launch*

Defendant argues that the SOW sets "a 'target,' *i.e.*, a goal" for the Commercial Launch date, not a required date, and thus imposes no contractual obligation for timing. *See* Dkt. No. 22 at 25–26. Defendant also argues that a Commercial Launch did occur. *See id.* at 26. In response, Plaintiff argues that the MSA established a required date for launch (*see* Dkt. No. 29 at 29–30) and that Defendant's "early test trials" were not sufficient to qualify as a Commercial Launch (*see id.* at 30).

The Court finds that Plaintiff has sufficiently pleaded a claim for breach of the Commercial Launch date provision. As an initial matter, the Court understands the Commercial

Launch date to be a contractual obligation. While the SOW does use the word "target" to describe the launch date (Dkt. No. 24-1 at 2), the SOW also provides for the Parties to change the date by mutual agreement in writing (*id.*) or for Plaintiff to "adjust as reasonably necessary any milestones or the Commercial Launch date" in the event of Defendant's failure or delay (Dkt. No. 24-1 § 1.3). As Plaintiff points out (*see* Dkt. No. 29 at 30), these provisions would be superfluous if the date was simply a non-binding goal. The use of "target" is best understood as an acknowledgement that one or both Parties might seek to change the Final Acceptance Date for Commercial Launch, which they could do by mutual assent (or Plaintiff alone could do for Defendant's failure or delay). Defendant provides no authorities of any kind to support its alternative interpretation.

The Parties also dispute whether a Commercial Launch *ever* occurred (*compare* Dkt. No. 22 at 26, *with* Dkt. No. 29 at 30), but the earliest possible events that might constitute a Commercial Launch occurred in September 2021 (Dkt. No. 1 ¶ 72)—well after the March 15, 2021, launch date set forth in the MSA and incorporated SOWs (*id.* ¶ 169). This is sufficient to allege a breach of contract on a motion to dismiss. It is thus unnecessary to assess on this motion whether and when a Commercial Launch occurred. On reply, Defendant raises the possibility that if a Commercial Launch was untimely or never occurred, Plaintiff's claim may be barred by estoppel or waiver (Dkt. No. 31 at 15); Defendant can properly present the arguments later at an appropriate time. *See U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019) ("[O]rdinarily, affirmative defenses . . . may not be raised on a motion to dismiss." (quoting *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1194 n.6 (9th Cir. 2018))). Therefore, as to Plaintiff's claim regarding the Commercial Launch, Defendant's motion is DENIED.

1

### c.    *Maximization of Orders*

Defendant argues that the MSA acknowledges the Parties' mutual interest in maximizing orders but does not impose any duty on Defendant to achieve those orders. *See* Dkt. No. 22 at 26–27. In response, Plaintiff argues that the MSA indeed creates a duty to "use commercially reasonable efforts to market and promote the ability of Customers to place and manage Replenishment Orders." *See* Dkt. No. 29 at 30–31 (quoting Dkt. No. 24-1 § 1.6). In reply, Defendant points out that this contractual language is not cited in the Complaint and that it did promote Plaintiff's services. *See* Dkt. No. 31 at 15–16.

The Court agrees with Defendant that Plaintiff does not allege a breach of the "commercially reasonable efforts" provision in its Complaint. *See* Dkt. No. 1 ¶¶ 166–175. The maximization language that Plaintiff quotes and cites in the Complaint (*see id.* ¶ 172) excludes the "commercially reasonable efforts" language in the same section of the MSA, and Plaintiff's own characterization of its claim (*see id.* ¶ 174) refers only to a failure to maximize. A plaintiff "cannot amend its complaint by advancing arguments solely in an opposition brief." *Compu-Link Corp. v. PHH Mortg. Corp.*, No. C22-983, 2023 WL 3456695, at *4 (E.D. Cal. May 15, 2023) (citing *Fabbrini v. City of Dunsmuir*, 544 F. Supp. 2d 1044, 1050 (E.D. Cal. 2008)). However, this deficiency could be cured by amendment. Therefore, as to Plaintiff's claim as to maximization of orders, Defendant's motion is GRANTED, and this portion of the breach-of-contract claim is DISMISSED with leave to amend.

### d.    *Diversion of Resources*

Defendant argues that "nothing in the Contracts prohibits [Defendant] from investing in other projects." Dkt. No. 22 at 27. In response, Plaintiff appears not to argue that any such prohibition exists, which Defendant points out (*see* Dkt. No. 31 at 14); instead, Plaintiff defends other bases for its breach-of-contract claim. *See* Dkt. No. 29 at 29–31. Therefore, to the extent

that Plaintiff alleges a breach for diversion of resources to other projects, Defendant's motion is GRANTED, and this portion of the breach-of-contract claim is DISMISSED without leave to amend, as amendment would be futile.

### e.    Good-Faith Cooperation and Timeliness

Though not addressed by Defendant in its motion, Plaintiff in its response raises an allegation of breach for failure to provide good-faith cooperation or to carry out obligations in a timely manner. *See* Dkt. No. 29 at 31 (citing Dkt. No. 24-1 § 1.3). In reply, Defendant argues that the cooperation provision "relates to giving access to information [Plaintiff] requested," and that such failure is not alleged. Dkt. No. 31 at 16. Defendant also argues that the timeliness provision "is a repackaging of the Commercial Launch breach" and thus similarly fails. *Id.*

The Court finds that the "good faith cooperation" obligation in Section 1.3 is tied to Defendant's obligation to provide information and other resources to Plaintiff so that Plaintiff can provide the contracted-for services. This obligation is contained in subsection (a) of Section 1.3, which is notably separated from subsection (c), the timing obligation. Therefore, to the extent Plaintiff raises a good-faith cooperation claim under Section 1.3, Defendant's motion is GRANTED, and the claim is DISMISSED with leave to amend.

However, to the extent Plaintiff raises a timeliness claim (echoing its other breach claim, *see supra* Section III.C.2.b), the claim is sufficiently pleaded and Defendant's motion is DENIED.

* * *

Therefore, as to Plaintiff's claim for breach of the MSA, Defendant's motion is GRANTED IN PART with limited leave to amend and DENIED IN PART, as detailed above.

D.    **Breach of Implied Covenant of Good Faith and Fair Dealing**

Plaintiff brings a claim for breach of the implied covenant of good faith and fair dealing in performance of the MSA, which is governed by Delaware law. *See* Dkt. No. 1 ¶¶ 176–184. Specifically, Plaintiff alleges that Defendant

> destroyed the purpose of the MSA by acting in bad faith to delay the national expansion of the Replenium Platform, failing to incorporate service features specified in the SOW, failing to disclose to [Plaintiff] that [Defendant] was simultaneously developing its own auto-replenishment platform, failing to protect [Plaintiff's] Trade Secrets and other Confidential Information while developing its own auto-replenishment platform, using [Plaintiff's] Trade Secrets and other Confidential Information in connection with its development of the Albertsons Platform, and terminating the MSA on the eve of [Defendant's] nationwide expansion of the Replenium Platform to deprive [Plaintiff] of the benefit of its bargained-for Services Fees.

*Id.* ¶ 181.

"'The implied covenant is inherent in all contracts' and ensures that parties do not 'frustrat[e] the fruits of the bargain' by acting 'arbitrarily or unreasonably.'" *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022) (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017)). "[T]he implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." *All. Data Sys. Corp. v. Blackstone Cap. Partners V LP*, 963 A.2d 746, 770 (Del. Ch. 2009). "Where the contract speaks directly regarding the issue in dispute, '[e]xisting contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents." *Fortis Advisors LLC v. Dialog Semiconductor PLC*, No. 9522, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)) (internal quotation marks

omitted). "To sufficiently plead [a] breach of the implied covenant . . . a complaint must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Baldwin*, 283 A.3d at 1117–18 (quoting *Sheehan v. AssuredPartners, Inc.*, No. 2019-0333, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020)) (alteration in original) (internal quotation marks omitted).

Defendant argues that Plaintiff's claim fails because the terms of the MSA "govern all the conduct at issue," and the claim is essentially duplicative of its breach-of-contract claims. *See* Dkt. No. 22 at 27–28. In response, Plaintiff argues that Defendant acted in bad faith in performing its obligations, which violates an implied contractual term. *See* Dkt. No. 29 at 31–33.

The Court finds that Plaintiff's claim fails because the MSA governs the conduct at issue. Most of the allegations are plainly governed by the contracts here. The allegations regarding Defendant's "failing to protect" trade secrets or confidential information and using the information in connection with its development of the Albertsons Platform are essentially duplicative of the breach-of-contract (and trade secrets) claims. *See* Dkt. No. 1 ¶¶ 123–175. The allegation regarding Defendant's "terminating the MSA" is simply an exercise of Defendant's contractual rights of termination. *See* Dkt. No. 24-4 § 3. Finally, Plaintiff's allegation that Defendant "fail[ed] to incorporate service features specified in the SOW" is plainly governed by the MSA and properly brought as a breach-of-contract claim.

The only allegations that are not part of the contract are those regarding "delay[ing] the national expansion of the Replenium Platform" and "failing to disclose" Defendant's simultaneous development of its own platform. However, Plaintiff appears to have abandoned these breach-of-contract claims in its response to this motion—such that implying such duties as part of a good-faith obligation would circumvent the Parties' original bargain. *See supra* Sections III.C.a, III.C.d.

1    Therefore, as to Plaintiff's claim for breach of the implied covenant of good faith and fair

2    dealing, Defendant's motion is GRANTED without leave to amend, as amendment would be futile.

3    **E.    Promissory Estoppel**

4    Plaintiff brings a claim for promissory estoppel under Delaware law. *See* Dkt. No. 1

5    ¶¶ 185–190. The elements of promissory estoppel are: (1) "a promise was made"; (2) "it was the

6    reasonable expectation of the promisor to induce action or forbearance on the part of the

7    promisee"; (3) "the promisee reasonably relied on the promise and took action to his detriment";

8    and (4) "such promise is binding because injustice can be avoided only be enforcement of the

9    promise." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 347–48 (Del. 2013) (citing

10   *Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003)). "Promissory

11   estoppel does not apply . . . where a fully integrated, enforceable contract governs the promise at

12   issue." *Id.* at 348.

13   Defendant argues that Plaintiff's claim fails because it is based on "alleged promises [of

14   nationwide expansion] that contradict express contractual terms" of a fully integrated contract.

15   *See* Dkt. No. 22 at 28–29; Dkt. No. 31 at 16. Defendant also argues that Plaintiff cannot plead

16   the "promise" and "reasonable reliance" elements of the claim. *See id.* at 29. In response,

17   Plaintiff argues that "[Defendant] repeatedly induced [Plaintiff] to continue its work . . . by

18   promising that a national expansion was imminent," which was an independent promise not

19   governed by the MSA. *See* Dkt. No. 29 at 33–34.

20   The Court finds that Plaintiff has sufficiently pleaded a claim for promissory estoppel.

21   First, while a contractual relationship does exist between the Parties, Plaintiff alleges that

22   Defendant made a new, additional promise of a nationwide expansion, which is not included in

23   the MNDA or MSA and does not contradict their terms. Dkt. No. 1 ¶¶ 74, 78, 84, 88, 91, 104,

24   109; *see Chrysler Corp.*, 822 A.2d at 1034 ("The contracts governing other aspects of the

business relationship are of no consequence because the promises made . . . were in addition to the existing relationship."); *Grunstein v. Silva*, No. 3932, 2009 WL 4698541, at *8 (Del. Ch. Dec. 8, 2009) (holding that contract did not preclude promissory-estoppel claim where it did not directly involve "the contours of the agreement at issue in the litigation").

Defendant's authorities are distinguishable. *See SIGA Techs.*, 67 A.3d at 348 (barring promissory-estoppel claim where the promise relied upon was "expressly included" in the contracts; "Promissory estoppel does not apply . . . where a fully integrated, enforceable contract *governs the promise at issue*" (emphasis added)); *In re U.S. W., Inc. Sec. Litig.*, 201 F. Supp. 2d 302, 308 (D. Del. 2002) (dismissing promissory-estoppel claim because plaintiff shareholders could not rely on statements in a merger agreement to which they were not parties or beneficiaries, and because alleged promise was expressly included in merger agreement). Moreover, although the MSA does include an integration clause (Dkt. No. 24-4 § 18.12), Plaintiff does not allege that any *previous* promises induced formation of the contract, as (insufficiently) alleged in *James Cable, LLC v. Millennium Digit. Media Sys., LLC*, No. 3637, 2009 WL 1638634 (Del. Ch. June 11, 2009); instead, Plaintiff alleges that Defendant made *new* promises after the contract was formed.

The Court further finds that Plaintiff has sufficiently alleged the "promise" and "reasonable reliance" elements of the claim. As discussed above, Plaintiff plainly alleges that Defendant repeatedly promised to expand Plaintiff's services nationwide—allegations that are supported with specific representations by Defendant. Dkt. No. 1 ¶¶ 74, 78, 84, 88, 91, 104, 109. Further, the Court cannot say at this stage that it was unreasonable as a matter of law for Plaintiff to rely on those promises, given the repetition of those representations and the Parties' working relationship.

Therefore, as to Plaintiff's claim for promissory estoppel, Defendant's motion is DENIED.

1    **F.    Unjust Enrichment**

2        Finally, Plaintiff brings a claim for unjust enrichment under Delaware law. *See* Dkt.

3    No. 1 ¶¶ 191–197. "Unjust enrichment is 'the unjust retention of a benefit to the loss of another,

4    or the retention of money or property of another against the fundamental principles of justice or

5    equity and good conscience.'" *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting

6    *Fleer Corp. v. Topps Chewing Gum, Inc.* 539, A.2d 1060, 1062 (Del. 1988)). "It is a quasi-

7    contract theory of recovery to remedy the absence of a formal contract." *Tolliver v. Christina*

8    *Sch. Dist.*, 564 F. Supp.2d 312, 315 (D. Del. 2008) (citing *In re Kirkwood Kin Corp. v. Dunkin'*

9    *Donuts, Inc.*, No. 94C-03-189-WTQ, 1997 WL 529587, at *17 (Del. Super. Ct. Jan. 29, 1997)).

10    "A claim for unjust enrichment is not available if there is a contract that governs the relationship

11    between parties that gives rise to the unjust enrichment claim." *Kuroda v. SPJS Holdings, LLC*,

12    971 A.2d 872, 891 (Del. Ch. 2009); *accord BAE Sys. Info. & Elec. Sys. Integration, Inc. v.*

13    *Lockheed Martin Corp.*, No. 3099, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009) (describing

14    the "threshold inquiry" of "whether a contract already governs the relevant relationship between

15    the parties"). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment,

16    (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and

17    (5) the absence of a remedy provided by law." *Nemec*, 991 A.2d at 1130 (first citing *Jackson*

18    *Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch. 1994); then citing *Cantor Fitzgerald,*

19    *LP v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998)).

20        Defendant argues that, as with Plaintiff's promissory-estoppel claim, this claim fails

21    because the MSA governs the Parties' relationship. *See* Dkt. No. 22 at 29–30. Defendant also

22    argues that the claim fails because Plaintiff did not provide any trade secrets or confidential

23    information, and because any intellectual property created by Plaintiff for integrating orders in

24    Defendant's platform belong to Defendant. *See id.* at 30. In response, Plaintiff argues that the

MSA does not govern because the Parties contracted for Plaintiff to create the Replenium Platform in partnership with Defendant, not to help Defendant create its own platform. *See* Dkt. No. 29 at 34–35. Plaintiff also argues that this claim does not require the shared information to be trade secrets or confidential information. *See id.* at 35.

The Court finds that Plaintiff cannot allege a claim for unjust enrichment. Plaintiff plainly alleges that there are two contracts that govern the relationship between the Parties; indeed, Plaintiff rests upon them for its two claims for breach of contract. *See* Dkt. No. 1 ¶¶ 153–175; *Kuroda*, 971 A.2d at 891. Neither Party disputes the validity of the contracts, such that an unjust-enrichment claim can survive the pleadings stage as an alternative theory. *See Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315 (D. Del. 2008). Nor is there any indication that the contracts do not "govern exclusively the obligations or rights of the parties at issue." *Id.* Plaintiff tries to recast Defendant's alleged actions as being outside the purpose of the contracts (*see* Dkt. No. 29 at 35), but its arguments plainly center on Defendant's creation of an alternative platform using confidential information and trade secrets, which falls squarely within the Parties' contractual relationship.

Therefore, as to Plaintiff's claim for unjust enrichment, Defendant's motion is GRANTED without leave to amend, as amendment would be futile.

## IV.    CONCLUSION

Accordingly, Defendant Albertsons Companies, Inc.'s Motion to Dismiss (Dkt. No. 22) is GRANTED IN PART and DENIED IN PART. It is hereby ORDERED:

(1)    As to Plaintiff's trade-secrets claims, the motion is DENIED.

(2)    As to Plaintiff's breach-of-contract claims, the motion is GRANTED IN PART with limited leave to amend and DENIED IN PART.

(3)     As to Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, the motion is GRANTED without leave to amend, and the claim is DISMISSED.

(4)     As to Plaintiff's claim for promissory estoppel, the motion is DENIED.

(5)     As to Plaintiff's claim for unjust enrichment, the motion is GRANTED without leave to amend, and the claim is DISMISSED.

(6)     Should Plaintiff choose to amend, Plaintiff SHALL file the First Amended Complaint **within thirty (30) days** of this Order.

Dated this 11th day of February 2025.

Tana Lin
United States District Judge